## CLAYBORN v. TENNESSEE ELECTRIC POWER CO.—101 S. W. (2d) 492.

Middle Section.   November 7, 1936.

Petition for Certiorari denied by Supreme Court, February 13, 1937.

J. B. Daniel and George E. Kannard, both of Nashville, for plaintiff in error Clayborn.

Aust, McGugin & Spears, of Nashville, for defendant in error Power Co.

FAW, P. J. This is an appeal in error by Mrs. Sallie Clayborn (hereinafter called plaintiff) from a judgment of the Second circuit court of Davidson county, dismissing her suit against Tennessee Electric Power Company (hereinafter called defendant) and taxing her with the costs of the cause. The judgment of dismissal was based upon the verdict of a jury peremptorily directed by the court, on motion of the defendant, at the close of the plaintiff's evidence in chief.

Although stated in different forms in separately numbered assignments, the contention presented to this court in behalf of the plaintiff is that the trial court erred in directing the jury to return a verdict in favor of defendant, and in thereafter overruling plaintiff's motion for a new trial based on the action of the court in thus directing a verdict for the defendant.

Between the hours of 9 and 10 o'clock at night, on September 19, 1934, plaintiff suffered serious personal injuries as the result of a collision between an automobile in which she was riding and a pole erected by the defendant and upon which defendant's wires were strung for the distribution of electric current. The automobile was owned and driven by one A. J. Eller, and plaintiff was riding as an invited guest therein at the time she was injured. Plaintiff lived on Trinity lane in the eastern suburbs of the city of Nashville. A. J. Eller lived in Macon county, Tenn. He learned about 4:30 o'clock in the afternoon preceding the accident in question that his father had died at Old Hickory on that day, and he came to Nashville and invited plaintiff (who was a lifelong friend of his father's family) to go with him to Old Hickory, and it was on this journey that plaintiff was injured as aforesaid.

The accident occurred near the intersection of the Gallatin road and Maxey lane in the suburbs, but not within the corporate limits,

of the city of Nashville. The Gallatin road is a state highway and its general direction is north and south. Double tracks of the defendant's electric street railway, operated from the city of Nashville, parallel that part of the Gallatin road involved in this case, and the western line of defendant's railway right of way is adjacent to and coterminous with the eastern line of the right of way of the Gallatin road. Maxey lane comes from the east to its intersection with the Gallatin road, and crosses defendant's railway tracks and right of way immediately before it reaches Gallatin road. The post with which Eller's car collided is situated a few feet north of the northern line of Maxey lane extended across defendant's tracks and right of way, and on the boundary line between defendant's right of way and the right of way of the Gallatin road. This post is fourteen inches in diameter, and the aforesaid boundary line passes through its center.

At the time of the accident in question, the Gallatin road was paved with "concrete" to a width of twenty-four feet, and on either side of the concrete paving there was a gravel "shoulder," which was, at the curb of the pavement, from one-half to three-fourths of an inch below the surface of the paving.

The aforementioned pole of the defendant was twenty-six inches east of the eastern edge of the concrete paving, and it was a foot or more nearer to the paving than the other poles of defendant in the same line of poles for some distance both north and south from that point.

Trinity lane enters Gallatin road from the west 200 or 300 yards south of the point where the accident occurred, and Eller's car entered Gallatin road from Trinity lane, crossed to the eastern side of the Gallatin road, and was driven northward to the point where it struck defendant's pole as aforesaid.

Excerpts from plaintiff's testimony pertinent to the manner in which the collision occurred are as follows:

"Q. Were you traveling on the right side of the highway at the time it happened? A. Yes, sir.

"Q. As you went out, you say? A. Yes, sir.

"Q. Just tell the Court and jury how you went and what happened? A. We came up Trinity Lane, and there was a little filling station over there, and we went over there and we both drank a coca cola, and you know it was Fair week and you know what traffic there is, and he was trying to make his way back into the highway, and this car came up and all of a sudden we struck that post there, and the next thing I knew they had an ambulance out there carrying me to the hospital. . . ."

Cross-examination:

"Q. As I understand it you came up Trinity Lane? A. Yes, sir.

"Q. And you pulled on the right hand side of the Gallatin Pike, going east? A. Yes, sir.

"Q. And when you reached Maxey Lane, the car came out and you hit the pole, and that is about all you know about it? He was dodging this other automobile coming out, the other automobile? A. No, I don't think he was dodging this other automobile, he was trying to work his way back into the highway.

"Q. He was trying to work his way back into the highway? A. Yes, sir.

"Q. I thought he was already in the highway? A. I told you, explained to you as briefly as I could a while ago. We stopped over there at the filling station and drank a coca cola, and you know you have to work your way back into the highway, when you get off the highway.

"Q. Did you drive on the left or on the right? A. On the right.

"Q. All you had to do was to pull on the right hand side, wasn't it? A. Such traffice as there was, it was a job, there was a streak of cars as far as you could see.

"Q. And as you were going along, you had these cars meeting you? A. As we came out to Maxey Lane, I don't know how the accident occurred, I know something happened, sure.

"Q. After you came out of Maxey Lane, they crowded you and you hit that pole? A. I don't know whether he hit the pole, he was driving the car."

A. J. Eller, the driver of the car in question, was the only witness other than plaintiff who testified with respect to the circumstances attending the accident, and we quote from his testimony as follows:

"Q. Just state in your own way to the Court and jury how this accident happened. A. Well, we came off of Trinity Lane, went out and turned into the Gallatin Road out about Mr. Warren's service station, right across the street, and it was the time of the State Fair, a lot of traffic on the road, and I turned on the far side of the road going out towards Old Hickory.

"Q. Was that on your right side? A. Yes, sir.

"Q. All right? A. And we met a lot of traffic and the lights kind of blinded me, and when we got out there I think it was to Maxey Lane, where I hit this post, it looked like the road was all solid there.

"Mr. Spears: Of course we object to what it looked like.

"The Court: Sustain the objection, he can describe what the appearance was.

"Mr. Daniel: Q. Just describe what the appearance was? A. It looked like the road was concreted all the way out and traffic was coming and so I was trying to miss this traffic.

"Q. Traffic was going the other way? A. Going the other way, meeting me going into Nashville at the time of the State Fair, and meeting traffic on the road, and I ran into this post.

"Q. Got a little too far to the right? A. Yes, sir, I guess I did. I was trying to miss this traffic, watching it.

"Q. Was this road on your right side between the center and this pole, was it all apparently of the same color that night? A. Yes, sir.

"Mr. Spears: Wait a minute. If the Court please, I object to what was apparent.

"The Court: I will let him answer the question. Note your exception.

"Mr. Daniel: Q. Could you tell from the lights there and from the color of the concrete and the embankment next to it, the shoulder, could you tell where the concrete stopped? A. No, sir, I couldn't tell, it looked just like the pavement in the road.

"Q. And did you or not think you were on the highway proper when you struck this pole? A. Yes, sir, that is what I thought, I was on the highway.

"Q. How fast were you going at that time? A. Well, I don't think I was going over fifteen or twenty miles an hour at the outside, because I was just coming out Trinity Lane and changed gears, may be got into high gear, may be making fifteen or twenty miles an hour.

"Q. Had just got straightened out? A. Yes, sir.

"Q. What happened? A. We ran against this pole there, wrecked the car, Mrs. Clayborn was thrown against the front of the car, I was thrown against the windshield and steering wheel, cut my chin, my nose here, broke my glasses and hurt my breast against the steering wheel."

Cross-examination:

"Q. Mr. Eller, you say you turned off of Trinity Lane onto the Gallatin pike? A. Turned across.

"Q. You went across first I believe and stopped at a filling station and bought a coca cola? A. I said at Warren's filling station.

"Q. And after you got this coca cola you started on back out the Gallatin pike? A. Out toward Old Hickory, that is right.

"Q. Did you have any trouble getting back into the line of traffic? A. No, sir, as we came out of Warren's service station there was no traffic coming this way as I could see.

"Q. Not any traffic at all, didn't have any trouble then there? A. No, sir.

"Q. As a matter of fact you didn't have a hard time dodging back onto your right side of the road, there wasn't any traffic there? A. No, sir, as we drove into the road there wasn't any traffic behind us I could see.

"Q. There wasn't any traffic going out the same way you were going? A. Yes, some cars had just passed as we drove into the Gallatin Pike, we waited for the traffic to get by.

"Q. And they were on quite a long distance ahead of you? A. Yes, sir. . . .

"Q. These automobiles coming up crowded you, didn't they? A. There was a lot of traffic on the road going towards town.

"Q. They crowded you and blinded you too? A. The lights blinded me quite a little, yes, sir.

"Q. And you could not see exactly where you were, and that is the reason you ran off the road? A. Yes, I could see where I was at all the time, but I was trying to avoid this traffic. . . .

"Q. But you do know that you were blinded by the lights? A. The lights were coming and I was trying to keep away as much as possible, keep away from these cars as much as possible.

"Q. You don't contend that you, if you hadn't been going out there with the lights or anything blinding you, you would not have had an accident? A. I might have hit the pole just the same.

"Q. You are as liable to run off the concrete part of the road and hit a pole without anything to cause it? A. No, sir. It looked just like the width of the road, it was sitting there in the pavement.

"Q. Did you have good lights? A. Yes, sir. . . .

"Q. Do you contend— A. (Interrupting) I might have hit this pole if there hadn't been a car on this road at all.

"Q. You don't contend you would have hit it, if you had been looking ahead? A. I don't know about that.

"Q. Then you don't think the blinding of these automobiles, the lights blinding you, had anything at all to do with the accident? A. I didn't say they did.

"Q. You didn't say they did? A. I didn't say these cars were coming and that they blinded me.

"Q. But when you are blinded you do not know exactly where you are? A. I have driven lots of nights without a wreck.

"Q. But you ran off the road this night and hit a pole? A. I didn't run off the road.

"Q. Well, do you swear this was on the paved part of the road? A. It is where Maxey Lane turns off, and that looks just like the main highway. . . .

"Q. But you don't deny you were blinded by these lights? A. No, I didn't say I was blinded.

"Q. What did you say? A. I said I was trying to make it on the highway with these cars coming towards me that had a lot of bright lights.

"Q. You signed this, your statement, that the lights of these southbound automobiles meeting me blinded me? A. I might have said that, yes, sir, if I signed that statement. I haven't seen that statement.

"Q. That is correct, isn't it? A. Yes, sir."

The plaintiff had driven over the Gallatin road frequently prior to the accident in question, and Eller stated that he had been driving over it all of his life.

The plaintiff's declaration contains two counts. In the first count it is averred that "during September, 1934, the defendant carelessly and negligently maintained a pole on which was strung its electric wires so near the aforesaid Gallatin Highway that it was dangerous to the traveling public, especially to those driving at night."

And it is further averred in the first count that "the driver (Eller) inadvertently allowed the car he was driving to come in contact with the aforesaid post or pole which was so dangerously near the highway as to make the highway not reasonably safe for travel, and negligently kept and maintained unguarded, and when the car struck the pole. plaintiff, a passenger in the car without fault, was seriously and permanently injured."

In the second count of plaintiff's declaration it is averred that "during September, 1934, the defendant carelessly and negligently maintained a pole on which was strung its electric wires partly in the aforesaid Gallatin Highway, and it was thus a nuisance and dangerous to the traveling public especially to those driving at night." And it is further averred in the second count that "the driver inadvertently allowed the car he was driving to come in contact with the aforesaid post or pole which was partly in the Highway aforesaid, and negligently kept unguarded, and when the car struck the pole, plaintiff, a passenger in the car without fault, was seriously and permanently injured." -

It is seen that in the first count it is averred that the pole in question was maintained by defendant so near the Gallatin Highway that it was dangerous to the traveling public, especially to those driving at night; and in the second count it is averred that said pole was partly in the Gallatin Highway and was thus a nuisance and dangerous to the traveling public, especially to those driving at night.

With respect to the location of the pole, the proof shows, as before stated, that it was "partly in" the right of way of the Gallatin Highway; that is to say, its center stood on the boundary line and it projected seven inches into the right of way of the Gallatin road.

Certain facts were stipulated at the outset of the trial below which appear from the statements of counsel preserved by the bill of exceptions, as follows:

"By Mr. Spears: If the Court please, at this time, before we go any further in this case, I think we had better make these stipulations, if we can make them. I understood from Mr. Daniel, if we can make them I know we can get along without some proof;

and that is this: this lawsuit involved some poles placed between the paved portion of the Gallatin Highway and the street car tracks out there, and it is stipulated, as I understand it, that these poles were placed there with the express permission of the State and County and the Tennessee Electric Power Company for the necessary purpose of supporting the trolley wires of the Inglewood street car line, and were a necessary burden on this property, for the purpose of supporting this trolley wire that ran along the Inglewood car line out there.

"Mr. Daniel: Whatever Mr. Spears states the facts are about that, I will accept that.

"Mr. Spears. And also for serving electricity out there in that section, which wires were also carried.

"The Court: All right, that is agreed.

"Mr. Spears: And one other thing: it is stipulated that these poles that carry that line out there were properly constructed on the right of way.

"The Court: All right.

"Mr. Daniel: You mean by that I suppose that they were straight up and that they had wires across the top?

"Mr. Spears: There was nothing negligent about their construction, is what I mean.

"Mr. Daniel: That is, they were properly put down in the ground, and stuck out the right distance. Of course, we can't agree they were in the right place, that is the lawsuit.

"The Court: All right.

It appearing that the location and maintenance of the pole in question was authorized by competent authority, and that it was not in the paved portion of the highway set apart for vehicular travel, or so near thereto as to constitute an obstruction dangerous to such travel, it will not be regarded as a public nuisance. Meese v. Goodman, 167 Md., 658, 176 A., 621, 98 A. L. R., 480; Gulfport, etc., Traction Co. v. Manuel 123 Miss., 266, 85 So., 308, 309; Whitaker v. Southern Bell Telephone & Telegraph Co., 254 Ky., 178, 71 S. W. (2d), 423, 426; Griffin v. Chillicothe, 311 Mo., 648, 279 S. W., 84, 42 A. L. R., 1273.

A user of vehicles is not, as a matter of law, entitled to the entire highway from property line to property line. The highway not only serves the needs of the traveling public, but may also lawfully serve the public by furnishing the public the conveniences afforded by public utility companies, such as the defendant in this case. Gulfport, etc., Traction Co. v. Manuel, supra; Griffin v. Chillicothe, supra.

The general rule established by the modern authorities is that a public utility company lawfully maintaining a pole in or near a public highway is not liable for the damage to a person or

property resulting from a vehicle striking such pole, unless it is erected on the traveled portion of the highway or in such close proximity thereto as to constitute an obstruction dangerous to anyone properly using the highway, and the location of the pole is the proximate cause of the collision. See Annotations in 82 A. L. R., p. 395 et seq. and 98 A. L. R., p. 487, et seq.

The rule just stated is supported by numerous adjudged cases digested in the Annotations just cited above, and the Kentucky Court of Appeals in so holding states that, "There is no disagreement of the authorities" with respect to this rule. Whitaker v. Southern Bell Tel. & Tel. Co., 254 Ky., 178, 71 S. W. (2d), 423, 427.

It is quite clear that the pole with which Eller's car collided on the occasion in question was not an obstruction, or in any wise a menace, to automobiles driven on the pavement of the Gallatin road.

Plaintiff's witness John Wilkes, a civil engineer, so testified, and this would seem to be obvious as a matter of common knowledge. This suggests an inquiry as to whether Eller was "properly using the highway" when the accident occurred. When he drove the car from the filling station on the east side of the Gallatin road, opposite the mouth of Trinity lane, he did not drive upon the paved portion of the highway, but continued to drive northward for a distance of 200 to 300 yards on the macadamized shoulder at a speed of fifteen to twenty miles an hour until his car struck the pole in question. According to Eller's testimony, there was no traffic or other obstacle to his entrance upon his proper place on the pavement. He says that he continued to drive on the shoulder because he was "blinded" to some extent by southbound automobiles on the opposite side of the highway, and because the shoulder on which he was driving appeared to be a part of the highway— that there at the mouth of Maxey lane "it looked like the whole pavement of the road." And there is testimony of other witnesses that immediately north of the intersection of Maxey lane and Gallatin road and at the pole in question (which was only a few feet north of Maxey lane) the color of the "highway proper" and the shoulder was substantially the same and they were "practically on the same level." However, the testimony to which we have just referred related to the surface at the place where vehicles pass into and out of Maxey lane across the shoulder of the Gallatin road.

By paving and curbing the highway to a width of twenty-four feet, the governing authorities plainly designated the portion of the Gallatin road they intended to be used for vehicular travel. Griffin v. Chillicothe, supra. The macadamized shoulder was manifestly not intended for vehicular travel in the same manner as the paved portion of the highway, but was intended for use in emergencies, mainly as a temporary parking space. This is infer-

able from sectin 2690 of the Code, which provides that "no person shall park or leave standing any vehicle, whether attended or unattended, upon the paved or improved or main traveled portion of any highway, outside of a busines or residence district, when it is practicable to park or leave such vehicle standing off of the paved or improved or main traveled portion of such highway."

Eller was driving his car at a speed of fifteen or twenty miles an hour on the "shoulder" for a distance of "two or three hundred yards" before he reached the pole with which he collided. It is clear from Eller's testimony that if he had been looking ahead he could have seen the pole in time to avoid it, unless he was "blinded" by the lights of southbound automobiles on the opposite side of the highway to such an extent that his vision was obscured.

We are of the opinion that the defendant did not violate any duty it owed to the plaintiff and was not guilty of actionable negligence in locating and erecting the pole in question; with "the express permission of the State and County," at the place and for the purposes disclosed by the record, as such location was consistent with the proper use of the highway for public travel. Cooley on Torts (4 Ed.), vol. 3, section 452, p. 260.

The negligent act of Eller in driving upon the shoulder of the highway in the manner and under the circumstances shown in the record was, we think, the proximate cause of the collision between his automobile and defendant's pole and the resultant injuries to the plaintiff.

"Where two distinct causes, unrelated in operation, contribute to an injury, one of them being a direct cause and the other merely furnishing the condition or giving rise to the occasion by which the injury was made possible, the former will alone be regarded as responsible for the result." 62 C. J., p. 1127, section 40.

"A highway that is in suitable condition for ordinary travel, conducted in an ordinary manner, does not become defective because some extraordinary unforeseen condition arises, in consequence of which it is momentarily too rough or too narrow to meet all exigencies of the situation." 22 R. C. L., p. 199, par. 82.

We do not think the views above stated, or the authorities cited herein, are in conflict with the opinion in the case of Franklin Turnpike Company v. Crockett, 2 Sneed, 263, upon which plaintiff's counsel seem to rely with much confidence. In that case it was held that a post "planted at a safe and convenient distance beyond the margin of the road, as made and used," was not a nuisance. In the subsequent case of Cumberland, etc., Company v. Cook, 103 Tenn., 730, 733, 55 S. W., 152, 153, the significance of the limitation to "the road as made and used" is pointed out. In the last cited case the court (in an opinion reversing a judgment for plaintiff and sustaining a demurrer to plaintiff's declaration) said:

"The simple averment that the pole of the plaintiff in error was put within 'the chartered right of way of the Harpeth turnpike,' with which defendant in error came in collision in the nighttime, resulting in the serious injuries complained of, does not constitute a cause of action. It might have been placed within the right of way, and still not be a nuisance to the public; and, until it became such, it would not be the basis of an actionable wrong. As between the traveling public and the company erecting this post, all that could be required was that its location should be fixed at a 'safe and convenient distance beyond the margin of the road as made and used.' When an effort is made to hold it liable for improperly locating its poles, the question is, 'Is the safety of travel endangered?' If not, then one who is driving an uncontrollable team, as in Franklin Turnpike Co. v. Crockett, 2 Sneed, 263, or, as in the present case, in riding a vicious horse in the nighttime, comes violently in collision with it, and receives serious injury, is the victim of a misfortune, the consequences of which he cannot charge upon the company."

In the instant case "the road as made and used" for vehicular travel by the public was the paved road.

The learned trial judge peremptorily directed the jury to return a verdict for the defendant upon the ground that there was no evidence that defendant was guilty of actionable negligence, and in this we do not think he erred. The plaintiff's assignments of error are therefore overruled.

It is insisted for defendant that the plaintiff was guilty of negligence that proximately contributed to her injuries, and that, for that as an additional reason, the judgment should be affirmed. In overruling the plaintiff's motion for a new trial, the trial judge concurred in this view.

In view of our ruling upon the assignments of error, as already stated, it is not deemed necessary to enter upon a discussion of the question of plaintiff's alleged negligence, further than to say that we are of the opinion that, if there had been evidence of actionable negligence on the part of defendant, the plaintiff would have been entitled to have the case submitted to the jury upon the issue of contributory negligence. We think the conclusion just stated is supported by the cases of Dedman v. Dedman, 155 Tenn.. 241, 291 S. W., 449; Nashville, C. & St. L. Railway v. White, 158 Tenn., 407, 418, 15 S. W. (2d), 1; Tenn. Cent. Railway Co. v. Melvin, 5 Tenn. App., 85, 96-97.

It results from our action in overruling plaintiff's assignments of error that the judgment of the circuit court, dismissing plaintiff's suit at her cost, is affirmed. The costs of the appeal will also be adjudged against the plaintiff, Mrs. Sallie Clayborn.

Crownover and DeWitt, JJ., concur.