ELLIS v. ORKIN EXTERMINATING CO. et al.—143 S. W. (2d) 108.

Western Section.   December 6, 1939.

Certiorari Denied by Supreme Court, June 8, 1940.

John Galella and Lucius E. Polk, both of Memphis, for plaintiff in error.

McDonald, McDonald & Brown, of Memphis, for Orkin Exterminating Co.

Armstrong, McCadden, Allen, Braden & Goodman and Emmett W. Braden, all of Memphis, for New York Life Ins. Co. and Hobson-Kerns Co.

KETCHUM, J. In this case the plaintiff sued the Orkin Exterminating Company, Inc., the Metropolitan Life Insurance Company, and Hobson & Kearns Company for damages for the alleged wrongful death by asphyxiation of his intestate as the result of the negligence of the defendants. The plaintiff's intestate was his seven-year-old son, Winburn H. Ellis, Jr., who met his death when he entered the house in which he lived at 1057 Cummings Street, in the city of Memphis, after the house had been vacated by all the occupants and turned over to the Orkin Exterminating Company for a period of twenty-four hours, to be fumigated for the extermination of bed bugs and vermin. The negligence charged against the Orkin Exterminating Company is that after having sealed the house by taping, and locking the doors and windows on the inside, it released a quantity of a deadly gas known as hydrocyanic gas throughout the house for the purpose of exterminating the bed bugs and vermin, and left the premises unguarded, and with a rear window unlocked or insecurely fastened, thus making it possible for the plaintiff's son, aged seven years and seven months, to gain entrance to the house by means of said window. The negligence charged against the Metropolitan Life Insurance Company, the owner of the

property and the Hobson-Kerns Company, its rental agent, is that they knew of the deadly nature of the gas which was to be used by the Orkin Exterminating Company in fumigating said house, and that they were under the positive duty to see that said house was so locked and guarded while it was being fumigated as to make it impossible for anyone to gain entrance thereto until it was perfectly safe to do so.

The Orkin Exterminating Company demurred to the declaration and the Court overruled its demurrer. Thereupon it filed its general plea of not guilty, and in obedience to an order requiring it to plead all of its defenses specially, it filed its special pleas in which it set out the facts at great length and relied upon the fact that the premises had been vacated by all the occupants thereof and turned over to it for a period of 24 hours to be fumigated; the warnings that it had given of the poisonous nature of the gas it intended to use and the necessity of their remaining away during the 24 hour period; the other precautions it had taken for keeping all persons out; and' relied upon the defenses that the boy was a trespasser and not an invitee on the premises; that if it should be held that it was guilty of negligence, its negligence was not the proximate cause of the boy's death, but that his own willful and disobedient act in coming upon the premises and going into the house in violation of the warnings given was the proximate cause of his death; and it relied upon his contributory negligence, and that of his parents, as a bar to any recovery by the plaintiff.

The defendants, Metropolitan Life Insurance Company and Hobson-Kerns, by their pleas relied upon the same defenses that were relied upon by their co-defendant, the Orkin Exterminating Company, and upon the further defense that at the request of the tenant renting the premises they let the contract to Orkin Exterminating Company to rid the premises of bed bugs and vermin; that the Orkin Exterminating Company was engaged in that particular business and was highly skilled in it, and that it had the sole and absolute control of the premises for the purpose of fumigating them, and that these defendants had no control over the work, but that it (the Orkin Exterminating Company) was an independent contractor and performed the work in its own way.

There was a jury trial and at the close of the plaintiff's proof the trial judge sustained a motion for a directed verdict in favor of all the defendants and dismissed the plaintiff's suit. In directing a verdict in favor of the defendants the trial judge did so upon the ground that the plaintiff had failed to show any actionable negligence on the part of the Orkin Exterminating Company, and also upon the ground that the plaintiff and his wife, parents of the child, were guilty of contributory negligence which barred any recovery for his death.

The plaintiff seasonably filed his motion for a new trial, and the same having been overruled, he has appealed in error to this Court. There are four assignments of error, complaining of the action of the Court in granting a directed verdict upon the grounds stated.

█ The evidence is undisputed, being based entirely upon the evidence of the plaintiff and his witnesses. Taking that view of it most favorable to the plaintiff in error, as we are required to do in reviewing the action of the trial judge in sustaining the motion for a directed verdict, it may be summarized as follows:

The residence known as 1057 Cummings Street in which Winburn H. Ellis, Jr., met his death, is situated on the west side of Cummings Street, and is about 100 feet south of the grammar school known as Cummings School which he attended. He was seven years and seven and a half months of age at the time of his death, and was in the second grade at school.

The residence belonged to the Metropolitan Life Insurance Company, and the Hobson-Kerns Company was its agent in handling the property. On February 21, 1938, Miss Molly Dean, who was employed as switchboard operator at the Methodist Hospital, rented the house from the Hobson-Kerns Company at a monthly rental of $32.50; the house was a six room house having three rooms on each side, with a concrete front porch and a latticed back porch. Miss Dean's family consisted of herself, her mother and her brother, Guy Dean. They had previously lived at 1089 McLemore Avenue, and had occupied that house along with the Ellis family which consisted of Winburn H. Ellis and his wife and their seven-year-old son, Winburn H. Ellis, Jr. When Miss Dean moved to 1057 Cummings Street, the Ellis family moved with her and occupied the north part of the house while Miss Dean and her mother and brother occupied the south half. The two families divided equally the bills for rent, lights, telephone and other expenses except food. They cooked and ate separately.

When the Deans had been in the house a short time, they discovered that it was infested with bed bugs, so Miss Dean complained to the Hobson-Kerns Company and that company engaged the Orkin Exterminating Company to fumigate the house and rid it of bed bugs and vermin. The Ellis family was notified and agreed to this. On February 28th, Mr. Knox, a representative of the Orkin Company called to see Miss Dean, inspected the premises, measured the rooms, made notations on a paper and took a list of the people occupying the house; Knox then telephoned this information to the office of the Orkin Company, and while he was telephoning his employer he again inquired about the age of the Ellis boy and communicated this to his employer. Mrs. Dean and Mrs. Ellis were both in the house when Knox was there but did not take part in the conversation. Mrs. Ellis was in her part of the house and did not

hear it. In this conversation Knox told Miss Dean the name of the gas they would use but she did know what it meant. He did tell her that it would kill the bugs, and would kill anything that had blood in it; and in answer to her question whether it would kill her, he replied, "Yes, it would kill you." And in this connection he told her that it would require 24 hours to fumigate the house and kill the bugs, and that it would be necessary for everybody to stay away from the house for 24 hours.

On the following day (March 1st), a representative of the Orkin Company telephoned her that their men would be out on the following morning at 9:00 o'clock to fumigate the house, and again told her that it would require 24 hours and that they would have to arrange to stay away from the house for 24 hours while they were fumigating it.

Miss Dean told her mother of this conversation and asked her to notify the Ellis family that the Orkin people would be out the following morning to fumigate the house, and that it would take 24 hours, and that the Ellis family would have to arrange to stay away from the house for the 24 hours. Mrs. Dean delivered the message to the Ellises that evening while they were at supper; she told them that the men were going to use a gas that would kill anything that had blood in it, but did not tell them what kind of gas they were going to use. Mr. Ellis testified that he did not understand that they were going to use a deadly gas but thought that they were going to use a gas that contained sulphur or creosote. We quote from Mrs. Dean's testimony as follows:

"Q. What did Miss Dean, your daughter, tell you about it? A. Told me they were going to put out something to do away with the bugs, and she said it would kill anything that had blood in it, but I did not have any idea it would kill anything so quick."

And referring to her conversation with the Ellis family in their kitchen while they were eating supper, she says:

"A. And I walked in there and told them.

"Q. Where was the boy? A. He was there eating. They were all around the table eating.

"Q. Just state the exact words that you said there, and what Mr. Ellis said, if anything, or Mrs. Ellis? A. Well, I told them that I had bad news for them—that they would have to go away from home and stay all night.

"Q. For what purpose? A. That the men were coming out to fumigate the house and that we would have to leave home. . . .

"Q. You related to the Ellises what your daughter had told you about the fumigation of the house? A. Yes, sir.

"Q. And she said, as you have already said, that it would kill anything that had blood in it? A. Yes, sir."

The little boy was present when this conversation took place, and, of course, heard it. His father hold him while they were still at the

table that "he need not come home the next day, there would be men working there, and his mother and I would meet him at the school." And in answer to a question by the court as to whether he told the boy that he replied:

"A. Told him, yes, sir, he need not come home, that they were starting—and it would take 24 hours to do the work there, and there would be men there working.

"Court: They were still at the supper table? A. Yes, sir.

"Q. And you told your son that? A. Well, I spoke to his mother, and was talking to him—that's right."

He testifies that the boy was asleep when he left next morning, that he talked with his wife, but he was not permitted to relate the conversation, and that he left the boy's lunch money with his wife.

Mrs. Ellis testified that Mrs. Dean told them while they were at supper on the evening of March 1st that the men were coming out on the following morning to fumigate the house and that it would require 24 hours, and that her husband and little boy were there and heard what she said, but that she did not tell them that they were going to use hydrocyanic gas; and that when the little boy went to school on the following morning she told him the men would be working there that day and that she would meet him after school, told him to eat his lunch at the school; and that she gave him his lunch money; and that on other occasions when she was going to be away from home she had given him his lunch money and he had gotten his lunch at school, and that she instructed him to do that on this morning when he left to go to school.

Mrs. Dean had two canary birds and says the first thing she thought of when her daughter told her that the fumes would kill anything that had blood in it was her birds. She was at the house on the following morning when the men came to fumigate the house, and that she left soon after they came and took the birds with her.

The fireplace was closed up and taped and the doors were taped on the inside. All the keys to the house were delivered to the Orkin representatives and the doors were locked on the inside, and in addition special large strong padlocks were placed on each outside door on the outside, and large red warning signs were tacked up on or near each door, bearing the legend in large letters:

"DANGER
"Fumigating with Poison Gas
"Do Not Enter
"All Persons are Warned to Keep Away
"Orkin Exterminating Company, Inc."

The windows were equipped with sash locks and were screened with metal screens, and all the windows were locked from the inside except the north window in the west end of the Dean kitchen, which was right near the steps leading to the back porch of the house.

The lower sash of this window was found raised to a height of eighteen inches after the accident and the screen was on the back porch.

The first information of the tragedy came after the noon recess when the primary teacher noticed that Winburn was not at his desk and she sent Early Boyce, one of his class-mates, to his home to inquire about him. The noon recess for the primary department began at 11:40 and ended at 12:15 and it was approximately 12:30 when he was missed. Early went up on the front porch and looking through the glass at the side of the door discovered Winburn lying on the floor of the middle room on the north side of the house. He called another boy who happened to be passing and they went next door and told a Mr. Smith what they had seen, and Mr. Smith went back with them to the house. He discovered the west window up, could see the boy lying on the floor of the middle room of the house, and putting a handkerchief over his nose and mouth, tried to enter the house by the window to bring the boy out, but he could not stand the fumes so he came out and had the fire department called. This was about 1:00 o'clock. The fire department responded promptly, and with the aid of gas masks entered the house and brought the boy out; an ambulance had been called also, and hurried the boy to the Satterfield clinic, a few blocks away, but he was dead when they arrived there.

Mr. Ellis, father of the boy, came up later and upon learning from the crowd that had gathered that the boy had been carried to the clinic, hurried on there, and later returned to the house. The fire marshal, Mr. Buckalew, arrived at about 2:00 o'clock and made an examination of the premises; several windows had been opened when he arrived. Later, at about 2:15 or 2:30, Don Owen, Jr., a detective from the homicide department, arrived and made a further investigation, and Mr. Ellis went through the house with him. A number of people had been through the house before Owen and Ellis inspected it; newspaper reporters and policemen were also there. Mrs. Ellis arrived at about three o'clock.

Ellis and Owen went to the back where the window was up and noticed a little porcelain jar on the window sill. This was one of several such jars in which Mrs. Dean put the food for her canaries and placed it in the cage; she would wash them daily, leaving the one not in use upon the window sill. Detective Owen pulled the window down and found that it could not be pulled all the way down so that it could be latched because the handle on one side of the lower sash rail caught on this little jar, thus preventing it from coming all the way down. Mr. Smith also testified that he noticed this same condition. When Owen was called as a witness he was not permitted to testify as to what he saw in the room because so many people had been in the room before he got there. He testified that he

received the call at 1:55 o'clock, that he first went to the McLemore Clinic, that Ellis was still there, and that they went together to the residence.

Darrell Lyons, aged 13, went with Early Boyce to call Mr. Smith and went with Smith and Early to the back of the house where the open window was; he noticed a paint can on the ground and testified that there was a black handled screwdriver lying on the window sill—on the outside. He testified that his brother Ronald Lyons, 15 years of age, also saw the screwdriver, and went back later to look for it but did not find it.

Buckalew, the fire marshal who was the first officer to make an investigation, said Mr. Smith mentioned a screwdriver, and that he looked for it but did not find it. He said he examined the window to see if it had been nailed down but found no nail marks, and no sign that it had been pried open with a screwdriver or other instrument.

The gas that was used in fumigating the house was of such character as to cause immediate and severe discomfort; Smith was unable to bear the fumes and came out at once. One of the firemen, Irby, testified that the fumes burned his eyes and throat and caused his throat to swell and pain him all the evening; and Dr. Satterfield testified that hydrocyanic gas itself in sufficient concentration to cause death would give immediate warning of danger.

We have stated the facts at this great length because of the importance of the case and the earnestness with which the able attorneys for the plaintiff in error have presented the case in their brief and in the argument at the bar. There is much force in their argument that the Orkin Company was negligent in leaving the rear window of the house unlocked and the premises unguarded; and it may be conceded that in using such a dangerous agency as hydrocyanic gas in its work it owed a high degree of care in respect to all persons rightfully on the premises.

But that is not this case. The plaintiff and the members of his family had been warned of the poisonous nature of the gas the Orkin Company was going to use; they had been advised that the premises would have to be vacated for 24 hours and all of the occupants had agreed to this; had turned the keys over to the Orkin Company, and it had assumed absolute and complete charge of the place for that 24 hours. Under these facts the boy was a trespasser on the premises and the Orkin Company owed him only the duty which it owed to any trespasser.

It is shown that the gas was mixed with tear gas in sufficient quantity to make it noticeable and very unpleasant to one about to enter the window, and that this precaution was taken as an additional warning to any one about to enter the house. There is no proof that the employees of the Orkin Company left the window

open; on the contrary, if any conclusion is to be drawn from the proof in this regard, it is that after having taken the precautions to close and seal all the other openings in the house, they closed this window also by pulling it down after having used it as a means of exit. Nor is there any proof that the Orkin representatives placed the inverted paint can below the window. The record is silent as to this.

██ The fact that this was the plaintiff's home did not give to him and his family the right to enter the place during the 24-hour period that it was in the hands of the Orkin Company to be fumigated, and however innocent the boy may have been in his purposes in going back there, he was nevertheless a trespasser when he did so; and after having taken the precautions that it took, we cannot see wherein the Orkin Company was negligent in not anticipating that the boy would return and force an entrance into the house.

██ The negligence charged against the Orkin Company is that it left this rear window unlocked, and the place unguarded. Granting that it did this, still this cannot be said to have been the proximate cause of the boy's death; but rather, that his death was caused by his own willful and disobedient act in returning to the place and climbing into the window in violation of the instructions of his parents and the warnings of the defendant.

An illustration of this principle is found in the case of Eckerd's, Inc., v. Martha McGhee, a minor, by Next Friend, 19 Tenn. App., 277, 278, 86 S. W. (2d), 570. The plaintiff, a girl 15 years of age, sued the defendant, a druggist, for having sold to her bichloride of mercury tablets and tincture of iodine, in violation of section 18 of chapter 162 of the Acts of 1919, which prohibited the sale of poisons to persons under 16 years of age without a written order therefor from a responsible adult, the plaintiff having taken the tablets in a fit of despondency, as the result of which she became seriously ill, and claimed to have suffered serious and permanent after effects, for which she sued to recover in damages. It was held that although the druggest was guilty of negligence as a matter of law in selling her the tablets without a written order from an adult, because her act in voluntarily swallowing the tablets, with knowledge of what she was doing, and the probable consequences thereof, and not the negligence of the druggist, was the proximate cause of her injuries.

And in Clayborn v. Tennessee Electric Power Co., 20 Tenn. App., 574, 583, 101 S. W. (2d), 492, 497, the rule as stated in 62 C. J., 1127, sec. 40, is quoted with approval, as follows: "Where two distinct causes, unrelated in operation, contribute to an injury, one of them being a direct cause and the other merely furnishing the condition or giving rise to the occasion by which the injury was made possible, the former will alone be regarded as responsible for the result."

And, in Nashville, C. & St. L. Ry. v. Harrell, 21 Tenn. App., 353, 364, 110 S. W. (2d), 1032, 1039, the Court quotes the following from

the opinion in Cleghorn v. Thompson, 62 Kan., 727, 64 P., 605, 54 L. R. A., 402, as an apt statement of the same principle: " 'Negligence is not the proximate cause of an accident, unless, under the circumstances, the accident was a probable as well as natural consequence thereof—one which might reasonably have been foreseen by a man of ordinary intelligence and prudence.' . . . In cases of this character, where two distinct, successive causes, unrelated in operation, to some extent contribute to an injury, it is settled that, where there is an intervening and direct cause, a prior and remote cause cannot be made the basis of recovery of damages, if such prior cause did no more than furnish the condition, or give rise to the occasion, by which the injury was made possible. It seems to be sound in principle, as well as settled by authority, that where it is admitted or found that two distinct, successive causes, unrelated in their operation, conjoin to produce a given injury, one of them must be the proximate, and the other the remote, cause of the injury, and the court, in passing on the facts as found or admitted to exist, must regard the proximate as the efficient and the consequent cause, and disregard the remote cause." And in the same case the court say that: "Assuming the negligence of defendant there could be no recovery if the injury was one which could not have been foreseen nor reasonably anticipated as the probable result of defendant's negligence."

We have examined the cases relied upon by the plaintiff in error. They are distinguishable from the case at bar in the respect that the plaintiff or his intestate was in each case lawfully on the premises either engaged in his work, or present there with the knowledge and consent of the defendant, and therefore invitees on the premises. They were not trespassers and for that reason the cases are not applicable to the situation we have here. The cases cited are Walpole v. Tennessee Light & Power Company, 19 Tenn. App., 352, 89' S. W. (2d), 174; Tennessee-Jellico Coal Co. v. Young, Adm'x, 18 Tenn. App., 537, 79 S. W. (2d), 815; Garis v. Eberling, 18 Tenn. App., 1, 71 S. W. (2d), 215; Whirley v. Whiteman, 38 Tenn. (1 Head), 610; Day v. Consolidated Light & Power Co., 136 Mo. App., 274, 117 S. W., 81; and Adams v. Virginia Gas & Oil Company, 109 W. Va., 631, 156 S. E., 63.

The rule of liability to a trespasser is stated in Garis v. Eberling, supra, in the following language: "It is the universal rule that persons entering voluntarily upon the premises of another, out of idle curiosity or for their own pleasure or advantage, take the same as they find them, and the owner or occupier thereof is bound only to avoid wanton or willful injury to them." 18 Tenn. App., at page 12, 71 S. W. (2d), at page 222.

See, also, Clapp v. LaGrill, 103 Tenn.. 164, 174, 52 S. W., 134.

And this rule applies to children as well as to adults. See Kelley v. Tennessee Electric Power Co., 7 Tenn. App., 555, at page 559, where the following language is quoted from United Zinc & Chemical Company v. Britt, 258 U. S., 268, 42 S. Ct., 299, 66 L. Ed., 615, 36 A. L. R., 28 : ''Infants have no greater right to go upon other people's land than adults, and the mere fact that they are infants imposes no duty upon the landowners to expect them and to prepare for their safety. One the other hand, the duty of one who invites another upon his land not to lead him into a trap is well settled; and while it is very plain that temptation is not invitation, it may be held that knowingly to establish and expose, unfenced, to children of an age when they follow a bait as mechanically as a fish, something that is certain to attract them, has the legal effect of an invitation to them, although not to an adult. There can be no general duty on the part of a landowner to keep his land safe for children, or even free from hidden dangers, if he has not directly or by implication invited or licensed them to come there.''

The turntable or attractive nuisance cases constitute an exception to the rule, but those cases have no application here.

The plaintiff in error contends that the child was of such tender years as not to be able to appreciate the warnings given, and the danger to him in going back into the house. If this be conceded, then a greater duty was imposed upon the parents to keep him away. The trial judge accepted this view and held that the parents were barred by their own contributory negligence in not taking further steps than they did take to keep him from returning to the premises, basing his decision upon the case of Bamberger v. Citizens' Street Ry. Company, 95 Tenn., 18, 31 S. W., 163, 28 L. R. A., 486, 49 Am. St. Rep., 909. In view of the conclusion we have reached upon the other features of the case we do not deem it necessary to pass upon this question.

This disposes of all questions involved in the case. The assignments of error must be overruled and the judgment of the Circuit Court affirmed at the cost of the plaintiff in error.

Affirmed.

Senter and Anderson, JJ., concur.

## On Petition for Rehearing.

KETCHUM, J. The plaintiff in error has filed an earnest petition for a rehearing and we have carefully considered it.

The petition complains of the finding that Mrs. Dean told the plaintiff and his family that in fumigating the house the Orkin Company was going to use a gas that would kill anything that had blood in it. We think Mrs. Dean's testimony warranted this finding, but in view of the plaintiff's testimony that he was not told, and did not know, that a poisonous gas would be used, and that he

thought that creosote or sulphur would be used (although nothing was said to warrant this conclusion), we give him the benefit of the finding that he did not know that a deadly gas was to be used. It is our purpose to state the facts in the light most favorable to his contention.

We do not think, however, that this is a determinative fact in the case. It is undisputed that Mrs. Dean told the plaintiff and his family that the Orkin Company was going to fumigate the house, and that they would have to vacate the premises for at least 24 hours, and that they turned the place over to the Orkin Company for that time; they were advised that a gas which would kill bed bugs was going to be used; and the plaintiff and his wife told their son not to come home for his lunch that day, and gave him the money with which to buy his lunch at school. Under these facts we are forced to the conclusion that the boy had no right to enter the house, and that his own disobedient act in doing so was the immediate cause of his death. He had been warned to remain away, and in returning to the place and entering the house he was a trespasser, and the Orkin Company owed him only the duty which it owed to a trespasser, viz., not to willfully injure him.

The case presented is a most unfortunate one, and one which appeals greatly to the sympathy of the court, but we cannot be moved by this consideration. The petition for a rehearing presents no question which was not considered on the former hearing, and we find nothing in the additional cases cited to cause us to alter our conclusion reached on our former consideration of the case. The petition must therefore be denied.

Senter and Anderson, JJ., concur.