54

## JOHN S. TURNER, Plaintiff in Error, v. TENNESSEE VALLEY ELECTRIC CO-OPERATIVE, Defendant in Error.—288 S. W. (2d) 747.

Western Section, at Jackson.   October 5, 1955.

Petition for Certiorari denied by Supreme Court March 9, 1956.

W. W. Lackey, Savannah, for plaintiff in error.

Ross & Ross, Savannah, R. R. Haggard, Waynesboro, for defendant in error.

BEJACH, J. This cause involves an appeal by John S. Turner suing as next of kin of Louis Don Turner from a judgment of the Circuit Court of Hardin County, resulting from the granting of a peremptory instruction in favor of the Tennessee Valley Electric Cooperative. The parties will be styled as in the lower court, plaintiff and defendant, the plaintiff being the plaintiff in error in this Court, and the defendant, the defendant in error here. The plaintiff sues as next of kin of Louis Don Turner, his son, who was electrocuted and killed when a live wire of the defendant came in contact with or arced to the boom of a crane, in connection with which plaintiff's son was working.

At the time of the death of Louis Don Turner, also known as L. D. Turner, he was employed by R. E. Martin, a contractor, as a member of a crew engaged in building a bridge located a few miles northeast of Savannah, Tennessee in Hardin County. The bridge under construction was a new bridge on what is known as the Cerro Gordo Road, leading from Savannah to Cerro Gordo,—which bridge was over Horse Creek in the vicinity of an old mill known as Paulk's Mill, and from which circumstance the bridge in question was known as Paulk's Mill Bridge. The bridge in question was a new bridge being erected several hundred feet up the creek from an old bridge in the same vicinity.

L. D. Turner, the deceased, at the time of his death was an unmarried, young man of the age of twenty-two years. He lived with his father and his sister and her child.

The defendant is a corporation engaged in the distribution of electric power to consumers in Hardin and Wayne Counties, Tennessee. It had erected and main-

tained poles and power lines for the transmission of electricity in the vicinity of the Paulk's Mill Bridge.

Sometime prior to the employment of personnel for building of the bridge here involved, and prior to commencement of work on same by the contractor, Mr. B. S. Walker, the contractor's general manager, came to Savannah from his home in Nashville for the purpose of making preparation for moving his crew into the area, and employment of personnel for the job, and for other matters preliminary to the beginning of work. At that time he went to the office of Mr. Bob Guinn, Jr., an acquaintance who was also in the contracting business and a resident of Savannah. The purpose of his visit to Mr. Guinn was to seek advice as to the proper person to contact in order to have the power lines of the defendant removed before construction work started. Mr. Guinn went with Mr. Walker to Mr. Ray May, a local undertaker, who was president of the defendant corporation. Mr. May was advised that the contractor's desire was to have the defendant remove certain power line wires located at and near the scene of the new bridge, in order to assure the safety of the construction employees, because there would be a crane and other machinery in operation by the contractor during the construction work. No specific time that such wires were to be removed was specified, but the request was for removal of same during the period of construction of the new bridge. Subsequent to the interview of Walker with Mr. May, R. E. Martin, the owner of the contracting business which had the contract to build the bridge, also made a trip to Savannah for the purpose of looking over the ground and making necessary preparations for the commencement of work. At that time he, also, went to

the office of Mr. Bob Guinn, Jr., with whom he was acquainted. While there, Mr. May was called and arrangements made for a representative of the defendant to go with Mr. Martin and Mr. Guinn to the site of the proposed bridge. Pursuant to this request, a Mr. Lightfoot, a representative of defendant, went with Mr. Guinn and Mr. Martin, or met them at the site of the proposed bridge. There the three men discussed the matter concerning the power line, and Mr. Martin requested Mr. Lightfoot to have the defendant take down its lines located at and near the site of the new bridge and move them completely off the right-of-way on the south or southeast side of the new right-of-way and new bridge, such request being made because of the danger to employees of the contractor, which would necessarily result from energized or ''hot'' power lines in the immediate vicinity of the construction work, because there would be a crane and other machinery in operation during the period. Such request for removal of the wires was made for the period of construction of the bridge.

After the interviews of B. S. Walker and of R. E. Martin and the representatives of the defendant corporation, the defendant did remove its electric lines completely from the area requested. Even the poles of defendant corporation were taken down and laid aside. Construction work was started about the last week in March, 1952, at which time the contractor moved a skeleton crew into the area and commenced employment of local personnel to fill out the construction crew. The deceased was one of the local employees. At the time the construction crew moved on to the job, defendant's wires were down. Construction continued until approximately May 24, 1952, at which time Martin's crew left

the job at Paulk's Mill Bridge temporarily for construction of a concrete culvert or bridge some miles nearer to Cerro Gordo. Work on the Paulk's Mill Bridge was thus suspended from May 24, 1952 until June 21, 1952. At that time the Paulk's Mill Bridge was approximately thirty to forty percent complete, only the concrete abutments having been constructed and no steel having been laid on them. During this interval of about four weeks, while Martin's men and machinery were away from the Paulk's Mill Bridge construction, the defendant reerected its poles and wires and energized the wires. When the crew and machinery were returned to the Paulk's Mill Bridge job, about June 21, 1952, the wires and poles of defendant had been re-erected and placed in the position which they occupied at the time of the death of plaintiff's son,—one pole having been erected some nineteen feet inside the highway right-of-way, and another pole some two feet inside the highway right-of-way. The power lines were not insulated. When the crew resumed work on or about June 21, it was necessary to move the crane down next to the bridge on the north and northeast side of the creek. Due to the nature of the terrain, the crane had to be moved in on the upper or south or southwest side of the bridge, between the bridge under construction and the poles and wires which had been reerected. At that time the crane came in contact with the wires, and the crane operator, as well as the superintendent on the job, then learned that the wires were energized or "hot". But work was continued on this job with the crane in operation until the death of plaintiff's intestate, which occurred August 13, 1952. The replacement or reerection of the poles and wires and their subsequent maintenance in the energized or "hot" condition by the defendant was all done without any notice by the defendant to either

60

Mr. Walker, Mr. Martin, or any other person connected with the employers of the plaintiff's intestate; and this, in spite of the fact that specific request, had been made by both Mr. Walker and Mr. Martin for the poles and lines to be removed during the full period of construction. Also, no permission to erect and maintain the wires at that point was given by any representative of the State of Tennessee.

On August 13, 1952, about noon, it became necessary to load a drag bucket into a dump truck by means of the crane, so that the drag bucket could be transported to one of the other jobs then being carried on by the contractor. The crane, drag bucket and truck, were all located on the south or southeast side of the bridge, between the bridge then under construction and the reerected wires, with the crane nearest the creek, but on the south or southwest side of same, and the truck back in towards the crane, facing away from the crane and away from the creek. The drag bucket was located on the ground to the right of the truck, between the truck and the bridge. The crane was thus used to lift the drag bucket and move same to the left and then down into the truck bed. The deceased, L. D. Turner, held a chain attached to one side of the drag bucket, while another employee held another chain, attached to the other side of the drag bucket. The crane was moved to the left to place the drag bucket directly over the truck bed, and then the bucket was lowered into the truck bed. But a part of the drag bucket caught on the side of the dump bed of the truck. In order to move the drag bucket slightly and drop it into the bed of the truck, the crane operator held the brake on the cable which raised and lowered the drag bucket, but moved the boom itself, slightly to the left in an attempt to pull the

drag bucket over into the dump bed of the truck. When this was done, the two men who held the chains, deceased, L. D. Turner, and the other employee who held the chain on the other side, dropped to the ground,—the deceased saying or yelling, "Oh!" as he fell. A doctor was called and deceased was given artificial respiration without success. He was pronounced dead shortly after his arrival at the Hardin County Hospital. The other employee, who held the other chain, recovered a few minutes after he was knocked to the ground, having apparently suffered little or no bad results. The doctor stated the cause of death to be electric shock and this was corroborated by the testimony of the undertaker.

After the accident on August 13, 1952, which resulted in the death of L. D. Turner, this suit was instituted by his father within the one-year period allowed by law. A declaration was filed October 31, 1953 in two counts. The first count alleged, in substance, the facts as stated above, and complained of gross negligence of the defendant in replacing and maintaining the electric wires at the scene of the accident, after having been requested that same be removed,—said replacing and maintaining in an energized condition having been done by defendant without any notice to the employer of plaintiff's intestate, or any of said employer's representatives. It was alleged that the creation of this dangerous condition by defendant, and maintenance thereof, under the circumstances set out, without notice to the contractor or any person on behalf of the contractor, amounted to gross negligence which was the proximate cause of the accident which caused the death of plaintiff's intestate.

The second count of the declaration alleged violation on the part of the defendant of Section 3708.102(*l*) of

Williams' Tennessee Code, by replacing said wires and energizing same without obtaining the permission or consent required by said statute. The declaration sought recovery of $25,000 for the death of plaintiff's intestate.

On November 18, 1953, the defendant filed a motion to strike the declaration of the plaintiff, which motion was argued and, subsequently, overruled by the Circuit Court judge,—an order to that effect having been entered on March 15, 1954. Defendant then filed a plea of general issue or not guilty on March 24, 1954. Plaintiff made a motion to amend his declaration in certain respects, which motion was granted by the court and plaintiff permitted to amend said declaration by interlineation. The order granting this permission was entered July 19, 1954. On the day of the trial, the defendant moved the court to be permitted to file an additional plea to the declaration, which questioned the right of recovery in this case because of the deceased having been covered by workman's compensation. But the trial court denied the application of the defendant to file such additional plea. The case was thereupon tried before a jury on September 1, 1954. At the conclusion of the plaintiff's proof, the trial court sustained the motion of the defendant to direct a verdict in its favor on the ground that there was no evidence under either count of the declaration showing negligence of the defendant, or that the defendant's negligence, if any, was the proximate cause of the death of the plaintiff's intestate. To this action of the court, plaintiff excepted. Later he filed a motion for a new trial on September 17, 1954, which was amended December 30, 1954, at which time said motion for a new trial was argued and overruled by the court. Plaintiff prayed an appeal in the nature of a writ of error to this Court.

Said appeal has been perfected, and the cause is now here for disposition by this Court.

The plaintiff, as plaintiff in error in this Court, has filed five assignments of error. These five assignments of error, however, present only one question for disposition by this Court, viz., whether or not the trial judge erred in granting a directed verdict at the end of plaintiff's proof; or stated differently, whether or not the cause should have been submitted to the jury.

In examining the record for review in such situation as is thus presented, it is the duty of this Court to adopt the view of facts disclosed by the evidence which is most favorable to the plaintiff. Klein v. York, 149 Tenn. 81, 257 S. W. 861, 31 A. L. R. 452; Dillon v. Carter, 18 Tenn. App. 176, 74 S. W. (2d) 391; Buckner v. Southern R. Co., 20 Tenn. App. 212, 96 S. W. (2d) 600; West v. Southern R. Co., 20 Tenn. App. 491, 100 S. W. (2d) 1004; Umstattd v. Metropolitan Life Ins. Co., 21 Tenn. App. 312, 110 S. W. (2d) 342; Ellis v. Orkin Exterminating Co., 24 Tenn. App. 279, 143 S. W. (2d) 108; Ansley v. Travelers Ins. Co., 27 Tenn. App. 720, 173 S. W. (2d) 702; Zamora v. Shappley, 27 Tenn. App. 768, 173 S. W. (2d) 721; McDonald v. Dunn Construction Co., 182 Tenn. 213, 185 S. W. (2d) 517; Draper v. Louisville & N. R. Co., 17 Tenn. App. 213, 66 S. W. (2d) 1003; Walton & Co. v. Burchel, 121 Tenn. 715, 121 S. W. 391, 130 Am. St. Rep. 788.

In this view of the situation, it is not necessary to quote in detail the testimony of all of the witnesses adduced in the instant case. The facts, as stated above, were taken from the testimony of the plaintiff's witnesses as preserved in the record of this cause. If plaintiff was entitled to have this case submitted to the jury, it must

be because the injury to and death of the plaintiff's son, which occurred in the manner above stated, might have been, or should have been, considered as a foreseeable event, resulting from the acts or omissions of the defendant. Tied in with this question is the additional question of whether or not, as is insisted by defendant, the acts of the employers of plaintiff's intestate constituted an efficient intervening cause which would relieve defendant of liability even if defendant was negligent.

We think, under the facts of this case, a jury might reasonably have found that such result was, or should have been foreseeable, and that the issue should, therefore, have been submitted to the jury.

There are a number of Tennessee cases dealing with death or injury caused by electricity, and we deem it unnecessary to consider cases outside of Tennessee except as quotations from some of them have been cited with approval in the Tennessee cases.

In the case of City of Lawrenceburg v. Dyer, 11 Tenn. App. 493, a verdict in favor of the administrator was affirmed by the Court of Appeals on November 23, 1929, and certiorari was denied by the Supreme Court, April 5, 1930. In this case, the administrator's intestate was killed by an electric charge in a guy wire with which he came in contact while going with a friend to look at the dam owned by the City of Lawrenceburg, which furnished electricity for its plant. Deceased and his friend were approaching the dam by an infrequently used path, but under circumstances which the Court held was a lawful use of said path, when the deceased came in contact with the guy wire which was charged with electricity by reason of a defective insulator on the pole to which the guy wire was attached. In affirming a verdict in the Dyer case, the

Court of Appeals, Middle Section, in an opinion written by DeWitt, J., quoted with approval from the opinion of Mr. Justice Chambliss, of the Supreme Court, in a formal trial of this same case, as follows:

"Recognizing as fundamental and general the principal that a company operating high-powered electric wires is under obligation to keep them in safe condition, if reasonably chargeable with knowledge, or if in the exercise of reasonable prudence bound to anticipate that people may lawfully come in close proximity thereto for purposes of either business or pleasure, the New York Court of Appeals expressly held, in Braun v. Buffalo Gen[eral] Elec[tric] Co., 200 N. Y. 484 [94 N. E. 206, 34 L. R. A., N. S., 1089] 21 Am. & Eng. Dec. Ann., 370, that this was a question for the jury. And 9 R. C. L., 1227, supports with many authorities its text, to the effect that questions of negligence in the maintenance of such wires are for the jury 'unless the negligence is so clear upon the evidence that intelligent minds cannot form different conclusions upon it.' " City of Lawrenceburg v. Dyer, 11 Tenn. App. 493, 503.

The opinion of the Court of Appeals in the Dyer case, also approved an instruction given by the trial court to the jury, as follows:

"Electricity is dangerous when not properly controlled, and it is the duty of those in charge of deadly electrical currents to exercise ordinary care and prudence to prevent electricity from escaping on to other objects where they may constitute danger to persons at places where the presence of persons was reasonably to be anticipated." City of Lawrenceburg v. Dyer, 11 Tenn. App. 493, 505.

There is a definite tendancy in the reported cases to hold that in case of one dealing with, or handling electricity, the duty towards the public requires a somewhat greater degree of care than is generally required. Thus, in the case of International Harvester Co. v. Sartain, 32 Tenn. App. 425, 454, 222 S. W. (2d) 854, 867. The opinion by Swepston, J., says:

"Electricity if not properly safeguarded, is one of the most dangerous and lethal agencies known to man.

In the case of Tennessee Electric Power Co. v. Sims, 21 Tenn. App. 233, 108 S. W. (2d) 801, which was a case where a verdict for the burning of plaintiff's home caused by defective wiring, was affrmed, the Court of Appeals (Eastern Section) in an opinion written by Ailor, J., said:

"Electricity has been described as being potentially the most dangerous of the utilities commonly used today, lurking unsuspectingly in the simple and harmless wire and giving no warning of its presence. And in the location of its wires an electric company has been held obligated to either insulate its wires or place them beyond the range of persons rightfully using highways and other public places, and to exercise the utmost care to keep them in a safe condition. Geismann v. Missouri-Edison Electric Co., 173 Mo. 654, 73 S. W. 654.

"The substance of the rule laid down in the above case seems to be that almost any harm from electricity which could humanly have been avoided would render the company liable in damages." Tennessee Electric Power Co. v. Sims, 21 Tenn. App. 233, 236, 108 S. W. (2d) 801, 803.

■ It is insisted on behalf of defendant in the instant case, that the accident which resulted in the death of Turner, was not reasonably to have been foreseen, and that, therefore, defendant should not be held guilty of any negligence which caused his death. The correct rule as to foreseeability, which we think is applicable in the instant case, is ably stated by Felts, J., in an opinion written by him for the Court of Appeals (Middle Section) in the case of Spivey v. St. Thomas Hospital, 31 Tenn. App. 12, 211 S. W. (2d) 450. This was a case in which the hospital was held liable for the death of a patient, who in a delirium escaped from his bed and fell from a third-story window resulting in his death. The question of liability depending on foreseeability of the occurrence, is disposed of in the following language of the opinion in that case:

"Learned counsel sharply differ in their views of the evidence. It is not for us, however, to settle such differences. That was for the jury. They rendered a general verdict for plaintiff, and we must take it as settling most of such differences in her favor. We have to decide only whether the circumstances of the case for plaintiff were sufficient, in point of law and reason, to permit the jury to find a verdict for her. Whirley v. Whiteman, 38 Tenn. 610, 616; Thayer on Evidence, 208-227, 234-250; Tyrus v. [Kansas City, Ft. & M. R. Co.], 114 Tenn. 579, 594, 86 S. W. 1074, 1077; Brenizer v. Nashville, C. & St. L. Ry., 156 Tenn. 479, 3 S. W. (2d) 1053, 8 S. W. (2d) 1099; Osborn v. City of Nashville, 182 Tenn. 197, 201, 204, 185 S. W. (2d) 510, 512.

"And in so deciding, we must look to all the evidence, construe it most favorably to plaintiff, take as

true that which tends to support her right, discard all countervailing evidence, and from the rest of it allow all reasonable inferences to uphold the verdict. Wildman Mfg. Co. v. Davenport Hosiery Mills, 147 Tenn. 551, 249 S. W. 984; Osborn v. City of Nashville, supra; Poole v. First Nat. Bank of Smyrna [29 Tenn. App. 327] 196 S. W. (2d) 563; Sepaugh v. Methodist Hospital [30 Tenn. App. 25] 202 S. W. (2d) 985, 989.

\* \* \* \* \* \*

"So the particular harm which actually befell Spivey need not have been forseeable. It is enough that some such harm of a like general character was reasonably foreseeable as a likely result of defendant's failure to use due care to keep him in bed and to protect him against getting out of the window in his delirium." Spivey v. St. Thomas Hospital, 31 Tenn. App. 12, 16, 28-29; 211 S. W. (2d) 450, 452.

Again it is insisted on behalf of the defendant in the instant case, even if the defendant be held guilty of negligence, that the death of plaintiff's intestate was caused by an efficient intervening cause which should relieve the defendant of liability; or that it should be held that the deceased's own contributory negligence caused his death. This contention is evidently based upon the circumstance of the crane involved in the instant case having come in contact with defendant's wires at the time it was moved onto the job some days before the death of plaintiff's deceased; and that deceased, himself, either knew or should have known of the danger as a result of such former contact. There is no evidence in the record showing that the deceased personally had knowledge that the crane had come in contact with defendant's wires which were "hot". In any event, both of these contentions made

on behalf of defendant have been disposed of adversely to its contentions by several decisions of our Supreme Court and of the Court of Appeals.

In the case of Osborne v. Tennessee Electric Power Co., 158 Tenn. 278, 12 S. W. (2d) 947, which was a case in which the Court of Appeals had reversed a peremptory instruction on behalf of the defendant, which action of the Court of Appeals, the Supreme Court affirmed, there was involved a suit for the death of a fireman who had been killed under the following circumstances. A fire was in progress in Alton Park, a suburb of Chattanooga, and the flames from the fire were enveloping the lines of the defendant Power Company. The Power Company was notified of this fire and of the danger to its wires approximately an hour before its employees arrived on the scene to take care of the situation. In the meantime, the fire had burned one of the wires in two. It fell to the ground and electrocuted the fireman. The Supreme Court's opinion in this case, written by Mr. Justice McKinney after reviewing some authorities from other states, said:

"Applying this principle of law to the facts of this case, it appears that the defendant received notice from the police department that a building was burning in Alton Park. Within a few minutes it was advised by two parties as to the exact location of the fire, and that the flames had reached its high voltage wires and that the current should be cut off. The defendant, upon ascertaining the exact location of the fire, knew that its high-voltage wires were adjacent to the burning building.

"While we do not undertake to announce any hard and fast rule, since each case must depend upon its

own facts, we are inclined to agree with the Court of Appeals that the plaintiff presented such facts as entitled her to have the jury say whether a reasonably prudent person would have shut off the current in such circumstances. We do not mean to say that in every instance the defendant should cut off its current upon being advised that its line is endangered. The character of the notice received, the nature of the threatened danger, the situation of the informant, his appearance and position, and other circumstances, are to be considered in deciding whether it is prudent and proper to cut off the current.

\*     \*     \*     \*     \*     \*

"Upon the question of contributory negligence we cannot say that as a matter of law the conduct of deceased was so negligent as to bar a recovery. That is a question for the jury to determine." Osborne v. Tennessee Electric Power Co., 158 Tenn. 278, 285-288, 12 S. W. (2d) 947, 950.

In the recent case of Rogers v. City of Chattanooga, 281 S. W. (2d) 504, 505, in an opinion for the Court of Appeals written by Carney, J., filed in the Eastern Section of the Court of Appeals, September 23, 1954, in which case certiorari has been denied by the Supreme Court, the following appears:

"The boom truck returned for another piece of steel, the cable had been tightened and the steel beam **was in the process** of being lifted. The deceased workman was standing on the ground holding or pushing on the steel beam to guide or keep the same balanced, when a current of electricity from the high tension wires ran down the cable through the piece of

steel and shocked the deceased, Ollie Y. Rogers, and another workman, George Skillern, who had hold of the other end of the steel beam. The driver of the boom truck pulled off to break the current; first aid was administered to the workmen, but the deceased died within a short time. The other worker, Skillern, was injured, but did not die, and was a witness for plaintiff in the trial below.

"The ground on which deceased was standing was very wet, and plaintiff contended that the atmospheric conditions and the heavy load of electricity on the wires caused the electricity to arc or jump from the line over to the boom cable, and that the boom cable itself never came in contact with the high voltage wires. There is proof by some of the witnesses that there were no burned or marked places on the cable, thus indicating that the electricity did arc and there was no direct contact. However, an eyewitness for defendant testified that it appeared to him that the cable came in contact with the high voltage wire itself. We do not see that it is material to a decision in this case to determine wherein the preponderance lies on this issue, and that the liability of the defendant would be the same, whether the electricity did arc to the boom cable, or whether the cable actually touched the wire. There is no question but that deceased died by electrocution.

"The defendant insisted, first, that it was guilty of no negligence and that it could not reasonably have foreseen that the plaintiff's intestate would have received the injuries sued for, and, second, that the proximate cause of plaintiff's injuries was a conscious intervening agency in the form of the operator

of the boom who, knowing the dangerous nature of the wires, deliberately and consciously chose to leave the boom extended to an unusual height with the result that the boom cable touched the wires and caused the accident.

\* \* \* \* \* \*

"It follows that we must hold that it was properly a matter for the jury to determine whether, under all the facts and circumstances, the acts of the defendant in erecting and maintaining the 11,000-volt power line uninsulated at the site of the accident in this case, at a height of 27 feet, constituted negligence, and if such conduct was found to be negligent, whether said negligence was the direct and proximate cause of the death of plaintiff's intestate."

In another case decided by the Tennessee Court of Appeals (Eastern Section) on the same day as the case of Rogers v. City of Chattanooga, to wit, December 23, 1954, viz., Kingsport Utilities Inc., et al. v. Lawrence Brown, et al., there were several defendants including the Kingsport Utilities Inc., distributors of electricity in Kingsport, referred to in the opinion as Utilities, and B. & S. Welding and Supply Co., referred to as B. & S. In this case there were several pertinent facts quite similar to the facts in the instant case. Among these was the fact that the foreman in charge of the crane had knowledge, obtained the day before the accident, that the crane had come in contact with the wires and that the wires were charged. In the majority opinion for the Eastern Section of the Court of Appeals signed by McAmis, P. J., and Howard, J., the following language appears:

"The assignments of error in behalf of B. & S. assert, in substance, there is no evidence to support the verdict against it; that plaintiffs were not employed by B. & S. but by the Williams Machine Shop and had been instructed by their employer to help with moving of the lathe in question; that they knew of the existence of the high tension line and the length of the crane and therefore were guilty of proximate contributory negligence as a matter of law; and that the trial judge erred in not granting its motion for a peremptory instructions made at the close of all the proof. It also asserted that the verdicts rendered were grossly excessive and showed bias, caprice, and prejudice on the part of the jury.

"We think the record presented a jury question as to the negligence of B. & S. Certainly the action of Carr in swinging the boom against or in close proximity to the high line as to cause the death of his superior, Mr. Still, and injuries to the plaintiffs were fortuitous, not intentional, but he was aware of the danger involved and was using a boom which was 10 feet longer than needed. Mr. Still evidently misjudged the clearance; he paid for that error with his life. But we cannot see how that would relieve B. & S. of liability. Nor can we see that plaintiffs were guilty of contributory negligence as a matter of law. Their attention was centered upon the moving of the lathe, not upon the top of the boom and the electric wires. There was nothing to charge them with knowledge that the boom would be improperly operated or to lead them to anticipate the fearful results that followed. They were in a place where they had a right to be, doing work they had the right

to do. They had the right to assume that Still and Carr would exercise due care in directing and executing this operation. We think it was for the jury to decide the question of negligence, proximate cause, and contributory negligence.''

The negligence of defendant in the instant case is, we think, aggravated by the circumstances that defendant had voluntarily acquiesced in the request of the contractor, Martin, deceased's employer, to remove its wires during the period of the construction of the Paulk's Mill Bridge. Defendant might have been in a stronger position if this request had been denied. Having granted the request however, when it restored and energized its wires with the bridge not more than thirty to forty percent completed, and without notifying deceased's employer or any of his representatives, it must be held to a higher degree of care and to a greater degree of responsibility in the matter, than would have been the case if the wires had never been removed. Under these circumstances, the continued use of the crane in the presence of defendant's wires, after the foreman of deceased's employer knew the wires were energized and that the crane had previously come in contact with same, cannot be held to be an intervening independent cause which would relieve defendant from liability for its negligence. In any event, we think the issues involved, of negligence, proximate cause, intervening cause, and contributory negligence, if any, should have been submitted for determination by the jury.

We have not previously discussed, in this opinion, the allegation in count two of plaintiff's declaration that defendant violated Section 3708.102 (*l*) of Williams' Tennessee Code which authorizes Electric Co-operatives

"To construct, maintain, and operate electric transmission and distribution lines along, upon, under, and across all public thoroughfares, including without limitation all roads, highways, streets, alleys, bridges, and causeways, and upon, under, and across all publicly-owned lands; provided, however that the respective authorities having jurisdiction thereof shall consent thereto".

If this Code section was violated it simply presents an additional act of negligence on the part of defendant, which would be negligence *per se*. The questions of proximate cause, independent intervening cause, and contributory negligence would still be for the jury to determine in accordance with the applicable principles set out in this opinion with reference to common-law negligence alleged in count one of the declaration. We therefore consider further discussion of count two unnecessary.

The result which we have reached is, therefore, that this cause must be reversed and remanded to the Circuit Court of Hardin County for a new trial to be held in conformity with this opinion.

The costs of the appeal are adjudged against the appellee, the Tennessee Valley Electric Cooperative. The costs of the lower court may await the final outcome of the cause.

Carney, J., concurs.

Avery, P. J., (Western Section), (dissenting).

As much as I dislike to do so, I feel constrained to and do dissent from the majority opinion in this case.

The facts of the case are condensed and set forth in the majority opinion and here only those facts necessary

to an understanding of my opinion will be referred to.

The Tennessee Valley Electric Co-operative had a franchise or easement from Hardin County to construct its transmission lines along the right-of-way of the public roads and highways of said County, granted by resolution of its Quarterly County Court, with usual restrictions relative to use of the roads and highways.

R. E. Martin was a contractor employed to build certain bridges on certain of said roads, one of which was Paulk's Mill Bridge. The road at that time was somewhat a relocation of the old county road. The work was being done by and through the State of Tennessee, and when finished the road was to be turned back to Hardin County. Three or four poles with transmission wires strung thereon, belonging to the Tennessee Valley Electric Co-operative, were located in the right-of-way for the relocation of this road as it traversed the creek bottom near Paulk's Mill Bridge. In 1952, after the contract was let, the supervising agent of the contractor conferred with the proper representative of the Electric Co-operative, and it was there agreed that some three poles and the wires located in the right-of-way would be removed so as not to obstruct the right-of-way, or interfere with a boom, trolleys, shovel, or other construction equipment to be used in the construction of the bridge, the piling for which a machine was used to drive.

In the Spring of 1952, a machine with boom equipment, and other construction equipment of the contractor was brought on to the site of construction and the work began. Local people were employed, together with laborers from elsewhere, by the contractor. One member of this local crew was plaintiff's decedent, Lewis Don Turner.

Much of the work on the bridge was done but not finished, and this equipment was taken away from the site of this construction and carried to the site of another bridge construction project by the contractor, where it was kept for several weeks. While this equipment was away from the Paulk Mill Bridge site, the Tennessee Valley Electric Co-operative reset the poles and restrung the wire in the edge of the new right-of-way for this road relocation, and re-energized these wires with electric power. This was the situation when the equipment in question was returned to the Paulk Mill Bridge site in early summer of 1952, for the completion of the work at that site.

The foreman and the crew all observed the re-set poles and the wires and knew that they were re-energized with electricity and were not insulated, though they were not so told by any representative of the Electric Co-operative. They also had actual knowledge shortly after the equipment was returned sometime in May or June, for the plaintiff's proof shows that in the operation of this boom, it came in contact with these current carrying wires, and the wires, on account of this contact with the steel part of the cable or the boom, were almost burned in two. No injury occurred at that time. It seems that the foreman and all of the crew working at that time saw what happened, and thereafter, as well as before, the foreman of the crew had admonished all of the members of the crew, including the decedent, of the danger of working with that boom in and about these wires and, particularly, in letting the boom come in contact with them or too close to them. Neither the foreman nor any member of the crew ever requested the Tennessee Valley Electric Co-operative to move or to de-energize these newly strung

wires, and continued to work there with that equipment until in August, 1952, when with this boom equipment an effort was being made to lift a heavy shovel, constituting a part of the equipment, into a truck. The work at that time was mostly completed and during this particular loading effort, deceased was holding to a cable or chain on that bucket so as to stabilize it and let it come into the truck bed. The operator of this crane equipment, at the personal instruction of the foreman who was present and directing what to do, in lifting this bucket or shovel from the ground to get it onto the truck, brought the boom against or so close to these high-powered transmission lines, causing actual contact or by arc electric current flowing from these power lines down the cable attached to the boom and out through the chain or cable being held by the decedent, his life was destroyed. This suit followed.

At the conclusion of the proof in chief by plaintiff, upon motion seasonably made by defendant, the Court directed the jury to return a verdict for the defendant, which it did, and the only question before us is the determination of whether the Court erred in so directing the jury. Of course, in determining our action upon the errors assigned, it is our duty to accept the facts disclosed by the evidence in the light most favorable to plaintiff. Proper reference to authorities is found in the majority opinion and will not be repeated here. So that, the question to be answered is:

Does this record reveal any material evidence of the negligence, alleged in plaintiff's declaration, which constitutes the proximate cause of the death of Lewis Don Turner?

We first look at the negligence charge in the declaration. This declaration is a sort of recital of the facts attempted to be proven. It avers, in the first count, that the Electric Co-operative was informed by the foreman or person in general charge of the construction that a "crane" would be used in the construction operation, and a request that these electric power lines be de-energized and the poles removed from the right-of-way; that defendant Co-operative complied with that request by moving the poles and taking the lines down, laying them on the ground off the right-of-way; that sometime after this was done the Electric Co-operative in May or June of 1952, while the crew was temporarily away on another job, reconstructed this power line by replacing the poles and restraining the wires and re-energizing them, and did not notify the State Highway Department, the County, or the contractor that such work had been done, or that they intended to do so, and

"said defendant corporation well knew, or by the exercise of ordinary and reasonable care, should have known, that the lives of said workmen would be jeopardized and endangered by such acts." (R. 3)

The declaration then sets out the fact that Lewis Don Turner, a member of the crew, was killed by the electric current from these lines running through the boom or cable as aforesaid, and alleges further that the power lines were uninsulated and that said defendant Co-operative

"was grossly negligent and careless in sending a deadly current of electricity through or over said power lines over the area where plaintiff's intestate and others were employed without first obtaining

permission to do so from said contractor or his representative, or without advising said contractor or his representative of said defendant's intention to do so." (R. 4)

And that

"said defendant having once removed the dangerous condition, they were bound not to recreate such a dangerous condition without obtaining permission from said contractor or his representative, or without advising said contractor or his representative of said defendant's intention to again create such dangerous condition, and violation of said duty under these circumstances amounted to gross negligence and willful and wanton conduct on the part of said defendant corporation." (R. 4)

The second count of the declaration repeats all of the alleged negligence of defendant set forth in the first count, and alleges negligence per se in the reconstruction and operation of these power lines in violation of Section 3708.102 (*l*) of Williams Tennessee Code, in that it had no authority from the County or the State to so construct these power lines along the right-of-way in question. This last or second count will not be further referred to because the proof is very clear that said defendant did have authority from Hardin County, which owned the right-of-way for this road, copy of the franchise being filed as part of cross-examination of plaintiff's witnesses.

Unquestionably, it was the duty of the Electric Co-operative, when it intended to or did reconstruct these power lines, under the circumstances above mentioned, to notify the contractor what it intended to or had done. However, the foreman of the construction crew and the

crew members, such as were introduced by plaintiff, all stated that they observed that these power lines had been reconstructed on their return to the site, and they experienced the fact that they were re-energized as aforesaid, and that no further or other request was made by the contractor, his foreman or any other person working along that area of the Co-operative to remove, further relocate, or de-energize these wires; that soon after the crew had returned to this project, the foreman warned all of them not to bring this crane, boom, or cable into contact with these wires. In addition to that, all of them had the actual experience of seeing what would happen if the crane was brought in such contact, because the operator actually brought the crane into contact with the wires within a day or so after they returned to work at that point and from that conact it was shown that these wires were burned badly, after which occurrence the foreman again admonished all the crew members to be very careful not to make contact with those wires. With full knowlodge that these wires had been restrung on the newly reset poles, and that they had been re-energized, can it be said that the failure of the defendant to notify the contractor that such reconstruction had been done, was the proximate cause of the death of decedent? What more knowledge could have been brought home to the contractor, the foreman, and the crew, than that which they had actually observed and experienced prior to August 13, 1952, the date of the death of decedent?

The plea of the defendant was simply that it is not guilty of the matters and things, wrongs and injuries in said declaration alleged.

If it can be said, which I do not concede, that the defendant was negligent in reconstructing these power-

lines, would such negligence constitute any part of the proximate cause of the injury to deceased, when the foreman brought his men in, put them to work, and he, as well as the men, knew and experienced the result of such alleged negligence? If so, I fail to see how.

It is insisted that the defendant could have foreseen the accident which might occur at the time it reconstructed the power lines, but there is not the slightest proof in this record that the Tennessee Valley Electric Co-operative knew that this crane would be brought back on that job for any purpose. It is also conceded by all of the testimony that there was no necessity for bringing this crane into contact with the wires as relocated, in order to complete the work remaining unfinished.

As I see the situation, the question presented on the facts as proven, is not whether the defendant knew or should have known that the contractor would use the crane in the course of construction of the remainder of the project, and that if such crane were so used it might come in contact with the relocated lines of the defendant, but the question to be considered, and which was considered by the lower Court apparently, is whether or not the defendant is charged with the duty of foreseeing that the foreman would, with full knowledge of the experienced dangerous condition created by these lines and the use of the crane at the place it was at the time of the accident, permit or direct the men to work at said place, thereby making probable the injuries to deceased, particularly since both the foreman and the men had seen what did happen when the boom or cable came in contact with the wires. The men had been admonished on at least two occasions about it and all continued to work.

We must bear in mind that the location of this bridge was out in the country, not near any house, industrial section, or residential area. The picture exhibits in the record, four in number by plaintiff, showing the bridge in question and looking both ways in the right-of-way, reveal this location to be in a wooded area and no house anywhere near it. Neither of these pictured exhibits show proof by reasonable inference or otherwise, that it was necessary to insulate these wires. The declaration does not allege that they were located too close to the ground.

I concede that electricity is a dangerous element when not properly controlled, and that it is the duty of those in charge of electrical current to exercise ordinary care and prudence to prevent its escape to other objects; that it is their duty to keep it in condition to safeguard the public against injury thereby in a reasonable way commensurate with the danger involved.

The foreseeable rule applies when the facts and circumstances justify the application thereof, but we are not confronted in this case with any such facts as were shown in the case of Osborne v. Tennessee Electric Power Co., 158 Tenn. 278, 12 S. W. (2d) 947. In that case fire had apparently reached the power lines of defendant and it was notified of that fact and that the current should be shut off. It was not done promptly, leaving a question for the jury. It might be that, in the instant case, after this foreman and the crew had seen the crane or boom come in contact with the electric lines, long before the date of the decedent's injury, had the defendant been notified to shut off the current, as was done in the Osborne case, supra, and after a reasonable time it had not

done so, that fact would have constituted foreseeable negligence.

The case of Rogers v. City of Chattanooga, Tenn. App., 281 S. W. (2d) 504, 509, in which opinion this member of the Court concurred, is not in point and not controlling. The general principles stated therein are correct, but in that case the City owned the power distribution system, had erected the poles and lines within the city, and within the business area thereof, had then granted a permit to construct a building right along beside these lines, which building construction required the use of a crane, and having granted such permit, after constructing its own lines, it was the duty of the City to insulate those wires, or at least to foresee that the uninsulated wires in the area of the authorized construction might cause injury to a laborer in such construction. In that case, it was said:

"The jury might well find that these defendants in erecting and maintaining a 11,000-volt electrical line at this particular location, to-wit, an industrial area, should have reasonably foreseen that someone might negligently allow an iron pipe, a boom cable, or other conductor of electricity, to come too close to the high-tension wire and as a result thereby one or more persons be killed or greatly injured. If the jury should find that the defendant should have reasonably foreseen that such might happen and failed to take the necessary steps to prevent the same, then it would be guilty of negligence which was the direct and proximate cause of such injuries."

We have no such location nor any such electric load shown by the instant record. I am unable to see the

applicability of the facts of that case to the facts in the instant case.

The majority opinion in the instant case also offers in support the case of Kingsport Utilities, Inc., et al. v. Lawrence Brown, decided December 23, 1954, but unreported, in which there was a dissent by Judge Hale, as a case in point, and in that case it was said:

"Defendant Utilities recognized that the area where the plaintiffs were injured was an expanding business section. In fact it defends its construction of the line beyond the point where it served its existing customers on the ground of anticipated business activity. Yet, it took no steps to insulate its wires as the record shows it might have done and had done in another business section of town. A jury might well say that in thus creating an unnecessary hazard without insulating its wires or raising them above the height of tools and machinery commonly used in construction and industrial activities, it was not in the exercise of the highest degree of care."

The area or location of the work being done, referred to in the Chattanooga case and in the Kingsport case, is entirely different from the country road area through creek bottoms. It seems to me, therefore, that the intervening carelessness of the foreman of the construction crew in putting his men to work, and keeping them at work, and directing the very operation where the foreman and the crew had seen and experienced the result of getting the crane too close to the charged electric lines, and that of the crane operator, coupled with the instructions and admonitions of the foreman and the activity of the laborers, as they were all there in the actual operation and construction, and in the operation of the crane in

lifting and loading the bucket into the truck, constitute an intervening act which amounts to the proximate cause of the injury and death of the deceased, if it could be found, as aforesaid, that the electric company was not exercising a high degree of care in the relocation of its power lines in the edge of the right-of-way at the cite in question.

I think the Trial Court properly instructed the jury to return a verdict in favor of the defendant, as in my opinion it is easily determinable, as a matter of law, that any act of the Electric Co-operative did not constitute any part of the proximate cause of the death of the decedent, Lewis Don Turner, and that with sound reasoning only that conclusion can be reached from this record.

In this day, when we have electricity everywhere and people have become fully aware of the result of coming in contact with it, and particularly those persons who work at a job that furnishes the experience and knowledge that the deceased in this case had, they are required to exercise reasonable care for their own safety.