WILLIE OSBORNE *v.* THE TENNESSEE ELECTRIC POWER CO.

(*Nashville.* December Term, 1928.)

Opinion filed January 21, 1929.

Boyd W. Hargraves, Ray & Valentine and Sizer, Chambliss & Sizer, for plaintiff in error.

Brown & Spurlock, for defendant in error.

Mr. Justice McKinney delivered the opinion of the Court.

This is an action to recover damages for the wrongful death of Gerald Osborne.

The trial court directed a verdict for the defendant. The Court of Appeals reversed the case and remanded it for a new trial. A writ of *certiorari* was heretofore granted by this court and the case has been argued by counsel at the bar of the court.

The deceased was employed as a fireman by the City of Alton Park, a suburb of Chattanooga.

The defendant is the owner of certain lines transmitting electric current in the City of Chattanooga, and of Alton Park. Thirty-third Street, in Alton Park, is about thirty feet wide and runs east and west. The plant of the Crane Enamelware Company is located on the north side of said street between Tarlton and DeLong

Streets. There are a number of buildings on the south side of the street, including a two story frame building about the middle of the block. There is a concrete walk on the south side of said street, in the northern edge of which poles have been erected by defendant upon which are strung seven wires, one of which transmits 11,400 volts of electricity. This was an emergency wire to supply St. Elmo, another suburb of Chattanooga, and a few houses in the vicinity of the Crane Enamelware plant. The current on this wire could be cut off without affecting the other wires. With the exception of this wire, the highest current transmitted on either of the other wires was 500 volts.

At the main plant of the defendant, which is two miles from the Crane Enamelware plant, a trouble department is maintained day and night, and a truck with two experienced linemen is kept in readiness to respond to any call, and it is a part of their duties to go to fires.

Under the fire alarm system in Chattanooga the defendant is informed of a fire at the same time that the fire company receives notice.

About eleven o'clock on the night of June 7, 1928, Baldwin, a foreman at the Crane Enamelware plant, looked through a window and noticed that the two story frame building across the street was on fire. The eaves of that house were ten or twelve feet from the transmission line of the defendant, and a strong wind was blowing from the south.

Baldwin testified that after telephoning the fire department he noticed that the fire had broken through and was getting up through the wires, and he called the trouble department of the defendant and told the operator in charge "that there was a fire across the street from

the Crane Enamelware Company's plant and that their wires were in danger and that they ought to cut them off.'' The reply was "All right, we have got it.''

Five minutes later Leon Spears, another employee of the Crane Enamelware Company, telephoned the trouble department of the defendant, and told them "there was a fire out there and told them where it was and I told them there was some high voltage wires that were right in the blaze and that the current should be cut off from them.'' He further testified that he advised them as to "the exact location of the fire.''

The operator in charge of the trouble department of defendant testified that when he learned of the fire from the police department he immediately sent the two linemen in the truck to the fire, which was six·or seven minutes before he received the first of several telephone messages from Alton Park, and that, in response to those calls, he replied that the truck and men were on the way.

After the alarm was sounded the fire truck, driven by Osborne, reached the fire in about fifteen minutes. Osborne parked the fire truck about ten or twelve feet north of a water plug located in the edge of the sidewalk, and from 120 to 160 feet east of the burning building. He had connected one hose with the fire plug and had it in use, and was on the north side of the engine connecting another hose when the high voltage wire burned in two, swung out into the street, struck the truck, and sent a voltage of electricity into the body of Osborne, resulting in his instant death. This string of wires was directly over the fire plug, and Osborne was about the middle of the street, or fifteen feet north of said plug.

There is proof that Osborne was killed thirty minutes after the fire alarm was given, or fifteen minutes after he arrived at the fire.

There is proof that the truck of the defendant, with the two linemen, did not arrive for thirty minutes after Osborne was killed. In other words, an hour intervened from the time the alarm was given until the truck and linemen of the defendant arrived.

The proof shows that the truck could be driven from the plant to the fire in from six to twelve minutes.

Following the general rule, we are stating the case from the plaintiff's standpoint. Most of these facts were controverted by the witnesses for defendant.

In holding that these facts made a case for submission to the jury the Court of Appeals said:

"Defendant in error insisted, and its proof tended to show, that it did all that it reasonably could after notice of the fire to relieve the situation of the menace of its wires, but whether after such notice as was indicated was received, it could, and should, by telephone orders have shut off the current, or have adopted the mode it did to further inform itself and act, and whether such investigations as it did make were with reasonable dispatch and efficiency under the circumstances, or whether the actions it did take were such that an ordinarily prudent man would have adopted under the circumstances, were questions for the jury and not for the court. . . .

"Undoubtedly if timely informed of the character of the menace which their wires had become they owed the deceased that degree of care that any ordinarily prudent man would have used under the circumstances to relieve the situation of the particular peril of the wires, and that care, whether it was to turn off the current, or

to send men two miles to cut the wires, or to take less efficient means, was commensurate with the danger to be avoided, and the deceased himself was obligated to use all means that an ordinarily prudent man would have used under the circumstances to look out for his own safety. These are the principles under which this case should be tried, and under which the proof must be measured.''

Counsel for defendant in their brief say:

''We fully recognize, as we have heretofore indicated, that the defendant under the law is required to exercise the highest degree of care in the maintenance and operation of its plants and its poles and wires, particularly when constructed along public streets, and, furthermore, that this duty comprehends not only the public in general, but exists in favor of individuals lawfully and rightfully in the vicinity of the wires.''

In 9 R. C. L., 1200, it is said:

''The degree of care which will satisfy this requirement varies, of course, with the danger which will be incurred by negligence, and must be commensurate with the danger involved, and, according to numerous decisions, where the wires maintained by a company are designed to carry a strong and powerful current of electricity, so that persons coming in contact with them are certain to be seriously injured, if not killed, the law imposes upon the company the duty of exercising the utmost care and prudence consistent with the practical operation of its plant, to prevent such injury. This is especially true of high tension wires suspended over the streets of populous cities or towns; for here the danger is great, and the care exercised must be commensurate with it. In determining the question of the degree of

care to be exercised, it is proper for the jury to take into consideration the location of the lines, whether in thickly or sparsely settled communities, the use to which they are to be put, the harmless or dangerous character of the current to be transmitted, their remoteness or proximity to travelers on the highway, and any other circumstances affecting the case.''

The operator in charge of the trouble department was placed there for the specfiic purpose of receiving notice for the defendant, and notice to him was notice to the defendant. 20 C. J., 361.

*(1)* ''Where an electric company receives notice that its wire is down in the street it should instantly turn the current off and keep it off till proper precautions are taken to prevent danger to persons or property from the fallen wire, and until it is ascertained that it is safe to turn it on.'' 20 C. J., 357; *Lutolf* v. *United Electric Light Co.,* 184 Mass., 53; *Madison* v. *Thomas,* 130 Ga., 153; *Lexington Utilities Co.* v. *Parker,* 166 Ky., 81.

In the Massachusetts case the third syllabi states the case and the conclusions of the court in this language:

''In an action against a corporation operating an electric light plant for causing the death of the plaintiff's intestate, there was evidence that nearly an hour before the plaintiff's intestate was killed by an electric shock received near a pole of the defendant, a servant of the defendant at the power house had received messages by telephone that the pole was on fire and that a wire was down there, and instead of causing the current to be shut off, which would have prevented the fatality, ordered an inspector to go to the place, and that the inspector might have arrived in from five to eight minutes, but that more than half an hour elapsed before the accident and the in-

spector did not arrive until after it had occurred. Held, that the jury properly could find gross negligence on the part of the servant at the power house in not ordering the current to be turned off and also gross negligence on the part of the inspector in not arriving at the place of the accident within a reasonable time.''

In the Georgia case a workman, unconnected with the defendant, had a merchant to telephone the plant that one of its wires was down. The court, in its opinion, said:

''If the superintendent of the electric light plant received notice that the wire was down, and the electric current was then on, he should have instantly turned the current off and kept it off until, after due investigation, the report was found to be untrue, or if found to be true, until proper precautions were taken to prevent danger to persons or property from the fallen wire.''

In the Kentucky case the defendant was given the same character of notice that was given in the instant case; that is, outside parties telephoned that a wire was down, and the court held that the failure of the defendant to cut off the current within twenty minutes after receiving the notice, was the proximate cause of the accident.

Applying this principle of law to the facts of this case, it appears that the defendant received notice from the police department that a building was burning in Alton Park. Within a few minutes it was advised by two parties as to the exact location of the fire, and that the flames had reached its high voltage wires and that the current should be cut off. The defendant, upon ascertaining the exact location of the fire, knew that its high voltage wires were adjacent to the burning building.

While we do not undertake to announce any hard and fast rule, since each case must depend upon its own facts, we are inclined to agree with the Court of Appeals that the plaintiff presented such facts as entitled her to have the jury say whether a reasonably prudent person would have shut off the current in such circumstances. We do not mean to say that in every instance the defendant should cut off its current upon being advised that its line is endangered. The character of the notice received, the nature of the threatened danger, the situation of the informant, his appearance and position, and other circumstances, are to be considered in deciding whether it is prudent and proper to cut off the current.

(2) It is also proper for the jury to take into consideration the means and methods by which the current is shut off, the necessary time it takes, and the territory and electrically run plants that would be affected thereby.

Where the servant in charge of the trouble department is informed of a dangerous situation he should interrogate his informant, ascertain who he is, obtain from him the facts, and if such a situation is presented as that a reasonably prudent man would shut off the current it would be his duty to order it shut off, and if he fails or refuses to do so he would be guilty of negligence which would be imputed to his master.

It is a serious matter to shut off the lights of a city and close down the electrically run plants. On the other hand, the deprivation of lights in a few houses for a short time would work but little inconvenience.

Counsel for the defendant cite *Pennebaker* v. *San Joaquin Light & P. Co.* (Cal.), 31 L. R. A., 1099. The following statement in the opinion in that case distinguishes it from the present case, to-wit:

"So that a recognition and understanding of the signal as being from district 4 or district 82 would indicate that the fire was somewhere within one of the five or six blocks embraced respectively in such district. The signal would not, and did not, of course, indicate the building, and would not and did not indicate whether the defendant company had light or power wires that would be affected by the fire, though of course there would be imputed to the company knowledge that it had such wires within the district."

In that opinion, with respect to the case of *Gannon* v. *Laclede Gaslight Co.* (Mo.), 43 L. R. A., 505, it was said:

"The defendant company showed that the wires were burned through, or their attachments burned down, through no fault of its own, by an accidental fire; that it received no notice; and, indeed, that there was no time between the falling of the wires and the accident in which it could have received notice so as to cut off the current. It made this proof full and complete by unimpeached witnesses and uncontradicted testimony."

In *New Omaha Thomson-Houston Electric Light Co.* v. *Anderson,* 73 Neb., 84, cited by counsel for the defendant, it was not contended that the defendant had any notice of the defective wire, and it was held that the employee of defendant, who was present when the accident occurred, was the servant of the city and not of the defendant at the time of the injury.

There is another reason why the case should have been submitted to the jury. As previously stated, there is proof that an hour elapsed between the alarm and the time the truck and linemen arrived at the fire, when the trip could have been made in from six to twelve minutes.

There is proof that Osborne was not killed for thirty minutes after the alarm.

If these linemen had exercised diligence according to the contention of plaintiff, they could have been at the fire in time to have shut off the current, cut the wires, or to have rescued Osborne from his perilous situation.

(3) It is the duty of the defendant to use due diligence in remedying a dangerous situation when advised of its existence. 9 R. C. L., 1217.

(4) Upon the question of contributory negligence we cannot say that as a matter of law the conduct of deceased was so negligent as to bar a recovery. That is a question for the jury to determine.

Several assignments of error relate to the construction and interpretation by the Court of Appeals of its rules with respect to filing assignments of error, briefs, etc.

This court has held in numerous cases that the action of the Court of Appeals in such matters is final and not subject to review by the Supreme Court.

In this case the Court of Appeals held that its rules had been sufficiently complied with to enable it to consider the case upon its merits, which was done, and we have likewise disposed of the case upon its merits, and, finding no error in the judgment of the Court of Appeals, affirm it.