LEBANON, TENNESSEE, Plaintiff in Error, v. J. M. JACKSON, Defendant in Error.

Middle Section. August 15, 1931.

Petition for Certiorari denied by Supreme Court, January 23, 1932.

16

Louis Chambers and William Green, of Lebanon, for plaintiff in error, town of Lebanon.

W. B. Williams and T. G. Hinson, of Lebanon, for defendant in error, Jackson.

CROWNOVER, J. This was an action to recover damages for burns and other personal injuries received by plaintiff from an overcharged electric light extension cord in his home. It was averred by plaintiff that because of the negligent manner in which defendant constructed and maintained its lines of electric wires, transformers, etc., current was transmitted from its high tension lines to its secondary or 110 volt line, and resulted in an excessive current being carried into plaintiff's house; and that plaintiff had attached an extension cord from said 110 volt line in his home out into the yard, where he intended to work, but said wire and extension cord became overcharged and when plaintiff took hold of said cord in preparation for the prosecution of his work, he was severely shocked, seriously burned and permanently injured.

The defendant pleaded not guilty.

The case was tried by the judge and a jury.

At the close of all the evidence defendant moved the court for a directed verdict, which was overruled.

The jury returned a verdict of $2000 in favor of plaintiff, from which defendant appealed in error and has assigned errors, which, when summarized, are as follows:

(1) The court erred in overruling defendant's motion for a new trial because there was no evidence to support the verdict and defendant's motion for a directed verdict should have been sustained.

(2) The verdict was excessive.

(3) The court erred in charging the jury that defendant should have exercised the highest degree of care in the construction and maintenance of its electric lines and wires.

(4) The court erred in its charge to the jury that the plaintiff alleged as follows: "He (plaintiff) alleges, further, that the insulators were not properly set, connected and grounded."

(5) The court erroneously charged that the defendant admitted that it must use the highest degree of care in the construction, maintenance and operation of its lines.

(6) The court erred in admitting, over the objection of defendant, testimony of a number of witnesses who resided in the neighborhood of Jackson, and whose lights were on the same line, as to overcharge of electric current in their homes, unusually bright lights, burned out lights, shocks, and other conditions which indicated an overcharge of electric current on this line.

The town of Lebanon owns and operates an electric distribution plant, and furnishes electric current and power for the use of its inhabitants, which it sells to them at retail, and it is necessary for it to own and have distributed over the town high tension wires carrying 2300 volts, and the current is taken from these high tension wires and distributed to the secondary wires carrying 110 volts for use by means of transformers.

J. M. Jackson, a married man, aged forty-four, built his home on Castle Heights Avenue, a short distance from West Main Street, in Lebanon, Tennessee. His house was wired for electricity by an electrician and attached to the lines of the town of Lebanon by employees of said town and was furnished current for lighting purposes by the town. He moved into the house about November 15, 1929.

On the morning of January 1, 1930, Jackson arose early, intending to connect a pipe to the down-spout of the gutter of his house to carry off the water. It was 5:30 in the morning and dark. He connected an extension cord to a light socket in his kitchen, screwed a bulb into the socket at the other end of the cord and extended the cord through the kitchen window out into the yard.

He then wrapped the cord around a stick which he leaned against the side of the house in such a manner as to hold the bulb up and throw light on the place where he intended to work. In making his preparations he used a flash light. He then turned on the light at the kitchen socket and went out to the northeast corner of the house. The stick was standing within about eight inches of the house. The eaves of the house extended about thirty inches. When within about two feet of the house he caught hold of the cord, intending to move the light. The ground on which he was standing was protected by the eaves of the house, was not wet but was moist. It had not rained.

The cord was faded but well insulated, the insulation being nowhere broken. He had frequently used the cord before that on outdoor work.

When he took hold of the wire he received an overcharge of electricity, was not able to relax his hold or to extricate himself from the wire, was paralyzed for an instant and unable to call for help. After about a minute he cried out for help and his wife heard him and came to his assistance. She tried to pull him away from the wire and received a severe shock. She then picked up a hatchet and threw it against the wire, the hatchet struck the wire before she had entirely released it and she received another shock. She then ran into the kitchen, and being unable in the darkness to find the button on the fixture, caught the cord and jerked it out of the socket.

Jackson was severely shocked and both of his hands were badly burned and his feet blistered and he has since suffered with pains in his back and with headaches. Mrs. Jackson was shocked and her hands were blistered where she took hold of the wire.

1. Defendant's first assignment is that there was no evidence to support the verdict, and that the court erred in not directing a verdict for defendant.

Plaintiff's proof is that at the time of this accident the line of electric wires going out West Main Street was in bad condition, the wires were old and the insulation worn off in places; the high tension wires and the secondary or 110 volt wires were on the same cross arms; the lines sagged in places and were strung too loosely, so that they could be blown together by the wind; the poles were placed too far apart; the cross arms had been broken and not replaced; limbs of trees had grown out among the wires, and where the insulation was off of the secondary wires and the limbs came in contact with the high tension and secondary wires, they would cause the current from the high tension wires to be transmitted to the secondary wires and cause an overcharge of current in the secondary wires, which would be carried into the homes of the

consumers. There were no ground wires. The transformers were not properly set, connected and grounded; the insulators were too small and inadequate; the high tension wires coming from cross arms on other streets crossed the streets obliquely instead of crossing directly at right angles, and were constructed too near other wires.

The plaintiff introduced a number of witnesses whose homes were supplied with electricity from the same line as Jackson's home, who testified regarding shocks and other unusual disturbances of the electric current in their homes at and just before this accident. One stated that he could not turn off the light in his hall on the night before the accident, but when the street lights were turned off next morning this light quit burning. Other witnesses testified that they were shocked on turning off lights, and one person was knocked down; that the wall switches vibrated and emitted sparks when they were touched; that bulbs and a radio were burned out; that the street light on the night before was unusually bright. Electricians later put on the stand stated that it was their opinion that these troubles were caused by excessive current coming into the homes over the secondary line.

Cordell Ladd, who operated a filling station about a quarter of a mile from Jackson's house, which station was supplied with electric current from the same line as Jackson's house, testified that at the time of Jackson's accident and for several days before the lights burned out and the bulbs melted, part of the insulation caught fire and burned off, the end of the line was glowing like a bulb; that the water pipes in the station were charged with electricity and persons who touched them were shocked; that he called Mr. Bone, who had charge of the electric plant and told him about it; that an employee of the electric plant came out and examined the meter and stated that the trouble was not in the meter. J. S. Rutland, who was employed at Ladd's Filling Station, testified that he received a shock when he went to drink water; that the ground wire was "buzzing like a bee;" that if you touched anything around the station you would be shocked.

It was insisted by plaintiff that the insulation on the electric cord was not broken anywhere before this shock, but that the broken places thereafter appearing and now shown on it were caused by the same current that burned his hands.

Defendant's proof is that the high powered wires and the low powered wires are not too near together although they are on the same cross arm; that the wires were not old, and the insulation not defective; that there was no necessity for the wires to be grounded; that the limbs of the trees growing among the wires could have no effect, that the current could not be transmitted by means of

these limbs to the low tension wires, that it would be conducted down the trees to the ground; that the current from the high tension wires was transmitted to the low tension wires, could not occur; that defendant had no notice of it, and was not chargeable with any notice in that by the exercise of the highest degree of care it could not find out about it.

It was the insistence of the defendant that the plaintiff was standing on moist red clay and caught hold of this cord which was old, worn and defective, and by reason of standing on the moist clay 110 volts of the current passed from this defective cord through his body to the ground, and caused his injuries.

We are of the opinion that there was sufficient circumstantial evidence for this case to go to the jury, and that the jury was not left to guess or speculate as to what caused the accident and injury. It was caused by overcharge of electricity. Walton v. Burchel, 121 Tenn., 715, 121 S. W., 391; Railroad v. Hall, 5 Higgins, 498; Railway & Light Co. v. Harrison, 5 Tenn. App., 34.

In view of the verdict of the jury and the evidence to support the verdict, there can be no doubt that an overcharged wire shocked and burned the plaintiff and caused his injuries, and this is a case for the application of the doctrine of res ipsa loquitur. Nashville Interurban Ry. v. Gregory, 137 Tenn., 422, 193 S. W., 1053.

"Where a thing which has caused an injury is shown to have been under the management of the defendant, and the accident is such as in the ordinary course of things, does not happen, if those having the management exercise the proper care, the accident itself affords reasonable evidence, in the absence of an explanation, that it arose from want of proper care." DeGlopper v. Nashville Ry. & Lt. Co., 123 Tenn., 633, 134 S. W., 609; Nashville Ry. & Light Co. v. Owen, 11 Tenn. App., 23.

The jury took the view of the plaintiff, and we are bound by it; therefore this assignment must be overruled.

2. We are of the opinion that the verdict of $2000 was not excessive. He was severely shocked and burned and suffered much pain. Both hands were burned and permanently injured, and at the time of the trial it was shown that he did not have normal use of either hand. The shock affected his nervous system and he cannot sleep at night, and has suffered with his back and head ever since the injury.

3. Defendant's third assignment of error complains of the court's charge to the jury that the defendant in the operation of its electric department was bound to exercise the highest degree of care.

There was no error in this charge. Electric companies must exercise the highest degree of care in the construction, operation and maintenance of the high tension lines consistent with the practical operation of the plant. Nashville Interurban Ry. Co. v. Gregory, supra; Memphis St. Ry. Co. v. Kartright, 110 Tenn., 277, 75 S. W., 719; Nashville R., etc., Co. v. White, 7 Higgins, 367, 20 C. J., 341-2-3, sec. 36; 9 R. C. L., 1200, sec. 13.

4. We are of the opinion that defendant's fourth assignment does not raise a serious question. The jury had heard the testimony of experts on both sides on the subjects of transformers and insulators and we believe that they understood that the judge inadvertently used the word "insulators" when he said: "He alleges further that the insulators were not properly set, connected and grounded," when he intended to say "transformers," and that they were not confused by this accidental use of the wrong word. There is enough in the charge for the jury to know that he meant "transformers." The charge fully explained to the jury the theories of the plaintiff and the defendant as to the city's electric equipment. It is the duty of the parties, where the court inadvertently uses the wrong word or expression, to draw his attention to it, and where it does not appear that the expression did any harm, the judgment will not be reversed. Carney v. Cook, 158 Tenn., 333, 13 S. W. (2d), 322.

5. There is nothing in the defendant's contention that the court erroneously charged the jury that the defendant admitted in its plea of the general issue or in the course of the trial that it was required to exercise the highest or utmost degree of care in the construction, operation and maintenance of its lines. It will be seen by reading the paragraph of the charge referred to in the fifth assignment of error that the court did not charge this, but stated that it admitted at bar that the municipal corporation did have charge of the distributing plant and distributed electricity to the citizens of the town. He then went on to charge the jury the duty of defendant in that respect and stated that it was the duty of the defendant to exercise the highest degree of care; hence this assignment must be overruled.

6. Defendant's sixth assignment, based on the court's action in permitting a number of witnesses who resided in the neighborhood of Jackson's residence and whose lights were on the same line, to testify that an excessive charge of electricity was coming into their homes, etc., before and at the time of Jackson's accident, is not well made.

Ladd testified that an excessive charge was coming into his filling station, a quarter of a mile from Jackson's residence. Bone, Commissioner of Public Works of Lebanon, in charge of the electric

light and power system, and Seagraves, employee of the town of Lebanon in the electric light and power department, both testified that Ladd's Filling Station and Jackson's house were on the same line; that there was no transformer or ground wire between them; that an overcurrent at Ladd's Filling Station would indicate an overcurrent at Jackson's house and all along the line.

Zaricor, Lehieu, Miss Ferrell, Crawford, Partlow and Miss Ethel Bass, residents of the neighborhood of Jackson, testified regarding the electric current in their homes and described conditions that would indicate that an excessive charge of electricity was coming into their homes at the time of Jackson's injury. All of these persons' homes are shown to be on the same line with Jackson's.

Cunningham was at the County Workhouse, on the same line, and he and his little daughter received shocks on January 1st.

Mrs. Helen Means testified that the street light was unusually bright on the night before. This street light's current was still on when Jackson was injured. The theory of Jackson is that the current of this high tension line was transmitted to the secondary wire, so testimony that there was excessive current on the street line was admissible.

The way the current affected the lights in other houses on this line is admissible. Kingsport Utilities, Inc. v. Mort, 2 Tenn. App., 277-8. This assignment must be overruled.

It was insisted that the town of Lebanon had no notice of the overcharge on this line, but there was proof that Bone and others had notice, which evidently the jury believed, and this was sufficient. 20 C. J., 361; Osborne v. Power Co., 158 Tenn., 284, 12 S. W. (2d), 947.

It results that all the assignments of errors must be overruled and the judgment of the lower court affirmed. A judgment will be entered in this court for $2000 with interest from November 17, 1930, to the present, in favor of J. M. Jackson and against the town of Lebanon. The cost of the cause including the cost of the appeal is adjudged against the town of Lebanon and the sureties on its appeal bond.

Faw, P. J., and DeWitt, J., concur.