244 F.2d 456
 CITY OF MARYVILLE, Maryville Electric System, and Maryville
Board of Public Utilities, Defendants-Appellants,
v.
Pearl FARMER, Administratrix of the Estate of Joseph Howard
Hammontree, deceased, Plaintiff-Appellee.
Pearl FARMER, Administratrix of the Estate of Joseph Howard
Hammontree, deceased, Plaintiff-Cross Appellant,
v.
CITY OF MARYVILLE, Maryville Electric System and Maryville
Board of Public Utilities, Defendants-Cross Appellees.
CITY OF MARYVILLE, Maryville Electric System, and Maryville
Board of Public Utilities, Defendants-Appellants,
v.
Mildred Gibson HAMMONTREE, Widow of Owen Franklin
Hammontree, deceased, Plaintiff-Appellee.
Mildred Gibson HAMMONTREE, Widow of Owen Franklin
Hammontree, deceased, Plaintiff-Cross Appellant,
v.
CITY OF MARYVILLE, Maryville Electric System, and Maryville
Board of Public Utilities, Defendants-Cross Appellees.
 Nos. 12808-12811.
 United States Court of Appeals Sixth Circuit.
 May 22, 1957.
 
 J. C. Gamble, Maryville, Tenn. (M. H. Gamble, Jr., Arthue B. Goddard, of Goddard & Gamble, Maryville, Tenn., and Hugh E. Delozier, Maryville, Tenn., on the brief), for City of Maryville, and others.
 J. H. Doughty, Knoxville, Tenn. (Hodges & Doughty, Knoxville, Tenn., and Charles S. Mayfield, Cleveland, Tenn., on the bdief), for Pearl Farmer, Administratrix, and Mildred G. Hammontree.
 Before SIMONS, Chief Judge, and MARTIN and McALLISTER, Circuit Judges.
 PER CURIAM.
 
 
 1
 In the United States District Court, the plaintiffs, Pearl Farmer (suing in her capacity as administratrix) and Mildred Gibson Hammontree (suing as widow), were awarded jury verdicts for the deaths by wrongful act of their respective decedents. Jury awards were in amounts of $33,000 for the death of Joseph Howard Hammontree and $29,000 for the death of Owen Franklin Hammontree. The cases were consolidated for trial and by stipulation have been heard together on this appeal. The defendants made timely motions for directed verdicts, both at the conclusion of the plaintiffs' proof and at the conclusion of all the evidence in the case. These motions and later motions for judgments non obstante veredicto were overruled by the district judge. The single issue for decision on this appeal is whether there is substantial evidence to support the verdicts of the jury. Throughout these proceedings, appellants for all practical purposes properly may be and have been treated as the same person.
 
 
 2
 The appellants (defendants) are engaged in the distribution of electrical power purchased from the Tennessee Valley Authority in the Maryville, Tennessee, area. They own, operate and maintain a system of transmission lines from which customers are served. The Tennessee Farmers Co-operative Fertilizer Plant, where the plaintiffs' decedents were employed and where they lost their lives by electrocution, was one of the customers of the utility. The Liberty Mutual Insurance Company, carrier of the workmen's compensation on the employees of the fertilizer plant, has made settlement for the two deaths. These actions were brought for the benefit of that insurance company and of all others who, under Tennessee law, are entitled to participate in the recoveries.
 
 
 3
 Upon the trial, development of the facts was necessarily a difficult task, most of the witnesses being experts whose technical testimony and opinions were couched in the language of electrical engineers. The briefs and oral argument hare and the entire record of the proceedings in the district court have been carefully considered, with the result that we find no inconsistency in the material testimony of the witnesses after assumptions have been separated from factual evidence.
 
 
 4
 There is no dispute as to the extent of the physical equipment owned and maintained by the appellants. Their transmission lines are connected into the T.V.A. system at a sub-station where 13,200 nominal volts are received. At various points along this line, energy is tapped off for distribution. In close proximity to the fertilizer plant where the accident occurred, appellants own transformers which step down the 13,200 nominal volts to a more usable potential of 440 volts. From the secondary connections of these transformers the plant's 'delta-delta ungrounded three-phase' electrical system is supplied. Another transformer steps down the 440 volts to a single-phase energy at 110 volts for lighting purposes. Appellants' wires are connected to those of the plant outside the building at the 'weather head'. Beyond the weather head, the wiring is owned and maintained by the consumer and the utility has no jurisdiction.
 
 
 5
 The appellants' hypothesis is that the electrocution was caused ultimately by faulty insulation on certain Kerney connectors located within the fertilizer plant's wiring system over which appellants had no authority. It is contended further that the failure of the consumer to supply an independent ground wire for the portable rubber-tired electric conveyor, which became charged with electricity while the decedents were in the act of turning it around, was a primary contributing factor to their deaths; and that such a ground wire in all likelihood would have prevented the accident by causing a fuse to blow, or by providing a path of low resistance to ground. In summary, the hypothesis of the appellants is that the defective wiring which proximately caused the deaths of these men was that of the fertilizer plant and not that of appellants, whose wires terminated at the weather head of the plant building.
 
 
 6
 Appellees, in the capacity of cross-appellants, insist that the trial court was in error in ruling that the doctrine res ipsa loquitur has no application under these circumstances. The effect of that doctrine, if applied, would necessarily shift the burden of producing evidence to the appellants. It is well settled that the doctrine res ipsa loquitur has no application where the defendant is not in exclusive control of the instrumentality which caused the plaintiff's injuries. Coca-Cola v. Sullivan, 1942, 178 Tenn. 405, 158 S.W.2d 721, 171 A.L.R. 200; Susman v. Mid-South Fair, 1944, 180 Tenn. 471, 176 S.W.2d 804. Here, the appellant had no control of the wiring within the fertilizer plant. 'It is the general rule that where a company merely transmits its electric current from its lines to the consumer wires, which it did not install and does not control, that the company has no duty to inspect such wires and is not liable for injury caused by defects in them.' Dabbs v. Tennessee Valley Authority, 1952, 194 Tenn. 185, 250 S.W.2d 67, 69. Appellants' hypothesis, which is supported by evidence, is that the accident resulted from defects in the wiring of the consumer. Under these circumstances, the ruling of the district court as to the res ipsa loquitur doctrine was correct. There being no merit in them, the cross-appeals are accordingly dismissed.
 
 
 7
 As background study, some of the technical testimony of the witnesses will be now summarized. The fertilizer plant was served by what is known as a 440 volt 'delta-delta ungrounded three-phase' electrical system. Three-phase systems are commonly used for industrial power applications. Three wires, or 'phases,' supply the motors which operate the machinery. All three of the wires are 'hot,' and anyone coming in contact with any two of them simultaneously will be either shocked severely, or killed. This is especially true where higher potentials such as the 440 volts used in the fertilizer plant are involved, for the reason that the human body's normally high resistance to the passage of an electric current will be more easily overcome by higher voltages. One hundred and ten volts, or less, may cause death by electrocution under some conditions. It is well known that the ground is a good conductor of electricity, particularly where it is damp and covered with hydroscopic mineral matter as was the condition in the Farmers Co-operative plant at the time of the accident. It should be observed that the plant's circuit was described as an 'ungrounded' system.
 
 
 8
 The testimony is to the effect that an ungrounded three-phase system under ordinary circumstances is not dangerous, and that a person standing upon the ground could touch any one naked wire of the system and experience nothing more than discomfort. The testimony is uncontradicted that two of the three wires serving the plant had become grounded, since two Kerney connectors in the switch room (by some means) had come in contact with the lid covering the metal trough in which they were located and had become 'fused' into the cover, thus making excellent electrical contact with the ground. In this way, the ground had become a charged electrical conductor; and a person standing upon it could be electrocuted if he came in electrical contact with the third or ungrounded wire, as this would complete the circuit through such person's body. Thus, the ungrounded and comparatively safe circuits had become grounded and consequently were more dangerous.
 
 
 9
 It is apparent that the metal frame of the portable conveyor which the decedents were engaged in turning around at the time of their electrocution had come in electrical contact with live wiring; otherwise, the men would not have been electrocuted. The only evidence showing how that equipment could have become charged is the testimony of one of the witnesses for appellees to the effect that the insulation on the portable cable supplying its motor had burned, or 'carbonized,' within a switchbox, providing a path which could be followed by the current to the metal frame of the conveyor.
 
 
 10
 The Kerney connectors referred to are metal devices used to connect heavygauge electric wiring that cannot be twisted together and soldered in the usual manner. In the switch room of the plant, there was a large junction box or trough which housed some of the wiring. Within that box the line wires were joined by Kerney connectors to load circuits carrying energy to various parts of the plant. This trough was wholly within the plant and under the control of those operating it. The Kerney connectors are uninsulated before their installation. After connections have been made, the electrician surrounds the joint with tape to form an insulating envelope. Several layers of rubber tape having high insulation value are first wrapped on. Friction tape is then applied over the insulating tape so as to protect the latter from mechanical damage. The connectors in the fertilizer plant were insulated in this manner and a metal cover or lid was then screwed over the trough. After the accident in which the decedents lost their lives it was discovered that the insulation on the Kerney connectors on two phases had broken down and the connectors had fused into the lid of the trough. As stated heretofore, this made good electrical contact with the ground rendering the plant's electrical system unusually dangerous. The essential difference in the hypotheses of the parties is as to the cause of the breakdown of the insulation on these connectors. Appellees sought to introduce evidence that the breakdown was caused by excessive voltages negligently introduced fron the appellants' wires, while appellants insist that there was probably mechanical contact between the Kerney connectors and the lid caused by either faulty insulation or puncture of the insulating tape by the sharp corners of the connectors.
 
 
 11
 The appellees (plaintiffs) had the burden of proof which they attempted to carry by introduction of extensive testimony of expert witnesses, especially that of Walter I. Self, an electrical engineer. The opinion of an expert can achieve no higher dignity than is justified by the facts or assumptions upon which his opinion is based. It is necessary here to separate facts from assumptions and to determine whether the assumptions were based upon substantial evidence.
 
 
 12
 The hypothesis of the plaintiffs-appellees is that the fertilizer plant had been newly constructed, had been wired in accordance with the highest standards of the art, and had passed the scrutiny of the electrical inspectors of the State of Tennessee; and that, therefore, the breakdown of insulation was not caused by defects in the insulation but by a 'surge' of high voltage from the appellants' wires greatly exceeding the design limits of the plant's wiring. The tape envelopes were removed from the connectors after the accident and were subjected to tests conducted at the University of Tennessee which supplied the required apparatus. Increasing voltages were applied to the insulating envelopes at points which had not been charred or burned. A breakdown of the insulation occurred at approximately 9,000 volts. On the basis of this experiment, expert witness Self concluded that this extreme voltage had entered the fertilizer plant wiring which was designed to carry only 440 volts. His conclusion necessarily assumes that the insulation value at the points tested was the same as the value at the points where the tape had been destroyed. A test of the charred places would be meaningless now.
 
 
 13
 The accuracy of Self's assumption is doubtful, as the testimony shows that a breakdown would have occurred at the weakest point in the insulation. Therefore, the points tested must have been better insulated than those which broke down. The testimony of the installing electricians that the insulation was sufficient and the Tennessee Electrical Inspector's assertion that he had approved the installation are not material here, inasmuch as this testimony related only to the condition of the wiring before the lid was tightened down on the trough some three weeks prior to the accident. There was no testimony relating to insulation resistance measurements, or 'megger tests,' made before the accident, so it cannot be stated accurately whether or not the insulation was damaged when the cover was attached or what its condition was at the time of the breakdown.
 
 
 14
 The validity of Self's conclusion, moreover, depends upon the truth of other assumptions. He must assume that the appellants' hypothesis is incorrect; that is, that there was no mechanical breakdown of the insulation. A further assumption made by Self was revealed upon cross-examination. Without making any tests, the witness had concluded that the surge-proof features and lightning arresters were defective on the three step-down transformers from which the plant is served, for these devices would have drained off most of such a surge to ground. He based this assumption on the 'fact' that 9,000 volts had entered the plant. This 'fact,' as we have seen, is in reality only an opinion which appellees are required to elevate to the status of evidence by proving the truth of assumptions upon which it is based. The assumption may not be proved by the conclusion sought to be drawn.
 
 
 15
 It was assumed, also, that switching operations were in progress at the time of the accident. The testimony is that all the members of the line crew were in the office at least twenty-five minutes before the accident and did not leave until some time after the electrocution. There is uncontroverted testimony that the last switches were thrown by the line crew prior to 7:00 A.M., nearly one hour before the accident, which occurred at 7:50 A.M.
 
 
 16
 To controvert this opinion of the expert, Self, based upon unsupported assumptions, appellants introduced direct evidence that in fact no such extreme voltages had been on the lines of the utility. The T.V.A. maintains an oscillograph capable of recording surges having a duration of only microseconds, whether the surge comes from its own lines or from the lines of the appellants. There were no recorded indications of such a 'surge' near the time of the accident. Several expert witnesses also testified, without contradiction, that had such voltages gotten into the wires of the utility, light bulbs, clocks, and other small appliances throughout the Maryville area would have burned out instantly. There is no evidence of any such burned-out elements, and there is direct evidence that the electric clock and appliances of the plant are still operative.
 
 
 17
 The testimony demonstrates not only that there was no surge, but also that there is no possible source of a surge of the magnitude asserted by the plaintiffs-appellees. The expert, Self, states that a surge could have come in, '* * * either from lightning or what is commonly known to the industry as a switching surge.' The possibility of lightning was ruled out by uncontroverted testimony by the weather man. The possibility of a 'swiching surge' alone remains.
 
 
 18
 A swiching surge originates in a transformer. Transformers can store energy within the iron core so that if the power supply is interrupted the stored energy may sometimes be dissipated throughout the system in a surge of induced voltage considerably higher than that usually carried. The amount of voltage dissipated in this manner will depend upon the characteristics of the transformer, particularly its power-carrying capacity. Witness Self testified that in order to produce a discharge, or surge, of the magnitude assumed here, a transformer of the 1,000 K.V.A. size, or larger, would be required. The evidence is uncontroverted that nowhere in the appellants' transmission system is there any transformer having this rating. It would have been impossible, therefore, for the appellants to cause even deliberately a switching surge similar to one which appellees contend was negligently transmitted into the fertilizer plant.
 
 
 19
 Appellees charge further that the appellants were negligent in maintaining their transmission system and equipment in a dangerous and defective condition. The only evidence alleged to support this charge pertains to certain circuit reclosers located in the lines between the Maryville sub-station and the transformers at the fertilizer plant. A recloser serves the same function as a fuse in household wiring, but is more complicated. When a short circuit or overload causes an excessive amperage to pass through, the recloser will open the circuit to protect wires and equipment. High percentages of transmission line overloads are temporary and selfclearing, such as difficulties caused by wind-blown tree branches brushing over the wires. For this reason, the recloser is designed to close the circuit again after a short period of time so that power will quickly be restored automatically. If the difficulty persists, the recloser will reopen and then will 'test' the circuits by closing two more times. If the difficulty still exists at the completion of these three cycles of operation, the recloser will go to 'lock out' position, cutting off the power until the recloser is reset. In order to restore service, the line crew must locate and correct the difficulties that cause the recloser to open. They then close it manually. Appellants' lines were protected by three of these reclosers, one on each of the three phases.
 
 
 20
 Inasmuch as one of the customers of the appellants used three-phase power, appellees insist that proper practice requires the use of one 'three-phase' recloser at this point instead of three single-phase reclosers. The former piece of equipment has the three reclosers mechanically interconnected so that if the element on any one of the phases goes through its three cycles to lockout position, the power will be cut off on the other two phases. This feature is to protect three-phase motors from burning out as the result of a 'single-phase' condition. Single phasing introduces no additional hazards to personnel using the equipment.
 
 
 21
 The evidence shows that one of these reclosers had begun a cycle of operation and had jammed in the open position before it reached the lockout condition. The operating arms on the reclosers indicated that they were in the closed position, but the position of the arm is not conclusive. The only sure test is whether or not current is flowing through; and the evidence conclusively shows that power had been interrupted. Voltmeter tests indicated this, as did the fact that after the accident the outage or single-phase condition was cured by 'strapping around' the recloser-- that is, by bypassing it with a 'jumper' or shunt wire. Thus, the recloser had done just what it was supposed to do in regard to disconnecting the circuit for the protection of the equipment. The only defective operation was that it had failed to restore power automatically to the circuit. Under these circumstances, it is inconceivable that either the malfunctioning recloser or the failure of the utility to inspect and conduct routine maintenance on that piece of equipment could be the direct and proximate cause of the accident. A dead electrical circuit can harm no one.
 
 
 22
 The evidence shows that the surge contemplated by expert witness Self was of very short duration, a few microseconds. There is nothing to contradict testimony that a recloser in perfect condition would not function with sufficient speed to interrupt such a surge. This would be true of three-phase and single-phase reclosers alike. The conclusion is inescapable that these reclosers could not have been the proximate cause of this electrocution, as there would have been no difference in result if the single-phase recloser actually in service at the time had been in perfect operating condition, or if one three-phase recloser had been in use instead of three single-phase reclosers.
 
 
 23
 Appellees contend that appellants were negligent in failing to warn plaintiffs' decedents or their employer of the defective condition existing in its transmission lines. We have already observed that, as demonstrated by the evidence, only a 'single-phase condition' existed at the time of the accident and that this condition introduced no additional hazards to personnel, inasmuch as a normally live wire which has become dead is harmless. Even if this were not so, the uncontradicted testimony is that the personnel of the fertilizer plant, including its electrician, had actual notice of the single-phase condition of the appellants' wires. There is no question about this, inasmuch as the fertilizer plant reported the outage to the utility only seconds before the accident.
 
 
 24
 Appellees cite extensive authority to the effect that power to all customers should have been shut off immediately when it was discovered that an irregular condition existed on its lines. All the cases cited are distinguishable upon their facts. Most of them disclose situations where live wires have fallen and the utility had notice of this dangerous condition. E.g. Dabbs v. Tennessee Valley Authority, 1952, 194 Tenn. 185, 250 S.W.2d 67. One case related to a company which failed to shut off its power when notified that a fire was raging below its high tension wires. Osborne v. Tennessee Electric Power Co., 1929, 158 Tenn. 278, 12 S.W.2d 947. In another, the defendant had notice that wires were sparking and causing flashes of fire in close proximity to a building. Virginia Electric & Power Co. v. Carolina Peanut Co., 4 Cir., 1951, 186 F.2d 816. In our judgment, these cases are in no way analogous.
 
 
 25
 In the instant situation, the defendant utility had no notice of a dangerous situation. There was only an open circuit or outage somewhere in its system, a condition which does not usually imply danger. Upon receiving complaint of this, linemen were dispatched to ascertain the trouble. A visual inspection was made of all lines and at least an hour before the accident several poles were climbed in order to make tests. No dangerous conditions were discovered then or at anytime thereafter. Where a utility has no notice of a dangerous condition and has made an inspection which reveals no hazardous situation, there is no duty to shut off the power to all customers. Judicial notice may be taken that an unwarranted interruption of power may cause serious and unnecessary economic loss and possibly even loss of life.
 
 
 26
 For the foregoing reasons, our judgment is that the verdicts of the jury are not supported by substantial evidence. The judgments are, therefore, reversed and the causes remanded to the district court with instructions to sustain the motions of defendants for judgments non obstante veredicto, dismissing the complaints.
 
 
 27
 McALLISTER, Circuit Judge (dissenting).
 
 
 28
 Joseph Howard Hammontree and Owen Franklin Hammontree were killed by electrocution on August 8, 1952, while working in the fertilizer manufacturing plant of the Tennessee Farmers Cooperative in Rockford, Tenn. The widow of Joseph Howard Hammontree received a verdict from the jury in the amount of $33,000 for the use and benefit of his four children; and the widow of Owen Franklin Hammontree received a verdict in the amount of $29,000 for the use and benefit of herself and her children, upon which judgments were entered. Appellants, City of Maryville, Maryville Electrical System, and Maryville Board of Public Utilities, here seek review of the foregoing judgments in this court.
 
 
 29
 The background of the case and the essential facts are as follows: The plant of the cooperative and all of its mechanical equipment were new. It had been in operation for only two months. The plant building was 100 feet long and 30 feet wide, with a switchroom south of the central portion of the plant and separated from it by a partition, but under the same roof. Electricity was furnished by appellants to the Tennessee Farmers Cooperative for use in the manufacture of fertilizer.
 
 
 30
 The Tennessee Farmers Cooperative utilized the electricity to operate certain mechanical equipment located in the central portion of the plant. This equipment, or machinery, consisted of a mixer, some bagging machines, stationary conveyors and portable conveyors, all requiring, for their operation, three-phase power of 440 volts.
 
 
 31
 We come now to the discovery that early in the morning of August 8, 1952 there was something wrong with appellants' power lines. About 3:30 A.M a rural customer notified the power company that he could not start his milking machinery because of a failure of electrical power. Other similar complaints were received that morning. The company, accordingly, sent out a number of its employees to find what caused the trouble. After several hours of searching fruitlessly for the cause, the men returned to the power company's plant. At 7:45 A.M. Mr. Koontz, an employee at the fertilizer plant, called the power company to report that they were unable to get any power because of an 'outage' or 'single phase condition' in the plant, which prevented them from starting a three-phase motor which operated the machinery and the portable conveyor. Within five or ten minutes of this telephone call, a charge of electrical voltage came over appellants' power lines and into the fertilizer plant, which killed appellees' decedents.
 
 
 32
 About an hour after the accident, a power company truck was driven up to the fertilizer plant, and one of the men in the truck told the superintendent of the plant that the power company was having some trouble on the line and that he wished to disconnect the power at the fertilizer plant for some time. The superintendent of the plant told the employee of the power company that there had just been a serious accident and that two men had been electrocuted at the plant; and the superintendent further stated that he didn't want anything in the plant touched. The employee of the power company replied that he only wanted to disconnect the power, which he did without coming into the plant.
 
 
 33
 At the time the two men were electrocuted, they were working in the building, moving one of the portable conveyors used in loading trucks. The portable conveyor machinery was operated by means of an electric motor, and inasmuch as it was moved or pushed about by the workmen from time to time throughout the building, it had attached to it an electrical cord which could be plugged into a socket connected with the electric power. As stated above, just before the accident, the two men, who were afterward electrocuted, were pushing the conveyor around the plant. At that time, one end of the electrical cord that carried voltage to the conveyor machinery was plugged into the electric socket in the wall of the plant, and the other end was connected to the conveyor; but the motor had not yet been switched on. The conveyor was on rubber tired wheels. As the two Hammontrees, appellees' decedents, and another man named King, were pushing the conveyor around to a different position in the plant, 'the electricity just hit us,' according to King, who said that he was knocked loose from the conveyor with the initial jolt. The two Hammontrees, as described by witnesses, seemed to 'freeze' as they tried to pull away from the conveyor; and by the time that the other employees had pulled the switch cutting off the power, both men were dead; and there is no question that their deaths were caused by electrocution.
 
 
 34
 All electrical energy used by the Tennessee Cooperative was supplied by appellants' transmission lines. The wires of appellants were joined to the wires of the Cooperative just outside the south end of the building, and were intended, and understood by all parties, to have a capacity of carrying not more than 440 volts. These wires were encased in conduits and entered the plant through a metal trough. Within the trough, the wires from inside the Cooperative and the wires carrying the electric current from outside, were joined by so-called Kerney connectors. Kerney connectors are metallic devices used in joining heavy gauge electric wires. The Kerney connectors in this case, within the trough, were encased in rubber tape, surrounded by friction tape, which according to undisputed evidence introduced on behalf of appellees, was sufficient to insulate against 9,000 volts.
 
 
 35
 After the accident, it was found that the voltage coming from appellants' wires had burned the rubber tape and friction tape surrounding the Kerney connectors in two places-- and at no other place in the trough; that the current had burned two holes in the metallic trough; and that the metal parts of the Kerney connectors had become welded to the metal trough. Moreover, where the insulated electric cord (which was plugged into the socket in the wall of the fertilizer plant) was attached to the switchbox of the portable conveyor, the undisputed testimony was that the insulation 'had been burned up from high voltage,' and a contact probably made between the electric cord and the metal conveyor. There is no evidence that the wires within the fertilizer plant, and within the metal trough, were not sufficiently insulated. In fact, all of the evidence is that the wires and connectors were insulated to withstand a current up to 9,000 volts. Appellants' theory is that the insulation around the Kerney connectors was insufficient. The proof is all to the contrary.
 
 
 36
 If the Kerney connectors had been so encased in rubber tape, surrounded by friction tape, as to be sufficient to insulate against 9,000 volts, then the burning through of such insulation and the resulting welding of the connectors with the metal trough, were obviously caused by a voltage of approximately 9,000 volts. If 9,000 volts were transmitted through appellants' lines and into the Cooperative plant-- which was known by appellants to utilize, with safety, only 440 volts,-- there is no question that the death of the two employees by electrocution resulted therefrom.
 
 
 37
 Was the insulation in question sufficient to insulate against 440 volts, which the wires and motors in the fertilizer plant were intended to carry?
 
 
 38
 The State Inspector testified that he examined the insulation after it had been installed, and prior to the accident; that when the line was energized with 440 volts, he had, in order to test the insulation when the current was switched on, placed his hand around the tape that covered the Kerney connectors; that he had felt no current or shock; that if there had been a naked place or a weak point in the insulation of the Kerney connectors, the voltage would have leaked through and he would have received a shock. The man who had wrapped the insulating rubber and friction tape around the wires and connectors testified that he had wound a minimum of two turns of rubber and two turns of friction tape around the wires and connectors, which in the opinion of all experts of both parties was sufficient to insulate against 9,000 volts. As an expert, the State Inspector testified that the insulation was proper and sufficient for the intended purpose and voltage.
 
 
 39
 When an official investigation was made subsequent to the accident, the rubber and friction tape envelope that had surrounded the Kerney connectors was removed and thereafter subjected to tests of electrical voltage at the laboratories of the University of Tennessee. The tests were made on the insulation, on the opposite side of the portion that had been burned through or charred. According to the testimony introduced by appellees' expert witness, this opposite side of the insulation envelope was sound, and 'had the same number of layers' of rubber and friction tape insulation as 'on the side where it was charred.' There was no testimony to the contrary. These tests revealed that it required 9,000 volts to break down the rubber and friction tape insulation on the sound side of the envelope. Other witnesses testified that the insulation was adequate for the voltage to be used by the plant; that the wiring in the plant conformed 'to the highest degree of the art;' that it met all of the requirements of the National Code and of the State Code; and this was undisputed. The Chief Electrical Inspector of the State of Tennessee made a four-day inspection of the plant after the accident and testified that there was nothing defective in any way in the wiring within the plant; and he could find nothing within the plant that had caused the death of the two men. No electricity was generated in the plant. Since there were no means, within the plant, of generating voltage, any voltage was bound to come from outside the plant. No electrical power ever entered the plant except through appellants' transmission lines.
 
 
 40
 As said before, the theory of appellants appears to be that the Kerney connectors were insufficiently insulated and thereby came in contact with the metal trough, resulting in grounding the electricity; that because of this grounding, the lethal current of 440 volts, which the wires and motor in the fertilizer plant were intended to carry, travelled along the damp floor of the plant. The appellants' theory further is that current was also coming through the electrical cord attached to the motor of the conveyor machinery; that in some way, the metal part of the conveyor itself became energized with electricity escaping from the cord, or motor, and that the current traveling along the floor and the current energizing the conveyor made a circuit through the bodies of the men who had their hands on the conveyor, in consequence whereof they were electrocuted. This is appellants' theory. But it is entirely contrary to the proof. The overwhelming weight of the evidence-- in fact the undisputed evidence-- is that the Kerney connectors were perfectly insulated for 440 volts, which was the specified limit of voltage capacity, and which was so understood by appellants. An insinuating suggestion is made by appellants that the insulation around the Kerney connectors was damaged when the metal trough in which the connectors and wires lay, was bolted to its metal cover, and that the sharp points of the connectors cut the insulation when the trough and cover were clamped over them, thereby causing the current to burn through the rest of the insulation and to fuse with the metal trough, thus grounding the current, and resulting in the death of the two men. However, the evidence is all to the effect that the insulation around the connectors, as found after the accident, would have been sufficient not merely for 440 volts, but for 9,000 volts. Moreover, the metal cover was bolted over the metal trough a month before the accident occurred. If the bolting of the cover to the trough had damaged the insulation of the Kerney connectors, it would have so damaged it at the time it was bolted, rather than a month afterward. There was no evidence that the Kerney connector had pierced the insulation, as a result of the clamping of the metal cover to the metal trough.
 
 
 41
 During the month subsequent to the time when the cover had been bolted to the metal trough, the portable conveyor had been used and the conveyor machinery had been operated by a current of 440 volts without accident or incident. Just before the accident, the men had been engaged for some time in pushing the conveyor around the plant. The electrical cord at the time was plugged in a socket in the plant wall, and was attached to the motor of the conveyor machinery; but the current had not been turned on at the motor.
 
 
 42
 What caused the lethal charge of electricity to kill the two men? It came from nothing within the plant. No electricity was generated in the plant. It came from no act that the men had done with respect to the conveyor. If the insulation around the connectors had been damaged by clamping the metal cover upon the metal trough within which the connectors were lodged, the damage to the insulation, as said above, would have occurred long before the accident when the cover had been clamped to the trough-- and there was no evidence of any such damage to the insulation. In fact, the evidence was all to the contrary. If the insulation around the Kerney connectors had been pierced when the metal cover had been clamped to the metal trough, the connectors would have burned through the insulation and fused with the metal trough two months before that event actually occurred.
 
 
 43
 It is true that a witness for appellants stated that there were places in the rubber insulation wrapping where there was no insulation at all, but he testified long after the accident; he was referring to the envelope of insulation that had been removed from the connector; and he pointed out where the tape, at that time, had been pulled apart. He had not seen the insulation, as had the other witnesses, when it was removed from the wires and connectors; and he admitted that the tape might have been pulled apart during the tests or in court during the trial. The tape, where the witness pointed out it had been pulled apart, was not carbonized, which would have been the case if the current had passed through at that point to the metal trough. The witness did admit that a voltage in excess of 440 volts would have been required to carbonize or disintegrate two layers of rubber tape and two layers of friction tape, which a number of witnesses, without contradiction, had testified was the insulation covering the connectors and wires at the time it was installed. Obviously the current would have passed through to the metal trough where there was no insulation, rather than were there was insulation to protect against 9,000 volts. Yet, no current appears to have passed through the metal trough at any place except where there was heavy and sufficient insulation. The undisputed testimony and the admitted facts lead to the inescapable conclusion that the tape had not been pulled apart until after it had been removed from the metal trough.
 
 
 44
 It was also contended by appellants that the fertilizer company was negligent in not having a ground wire attached to the conveyor; and, as an additional safety measure, this should have been done. But it is undisputed that, while such a ground wire would have been effective if the conveyor had been energized by 440 volts, it would have been of no effect and would not have prevented the accident, if a current of 9,000 volts had come over the fertilizer plant's wires.
 
 
 45
 In this case we must accept the following undisputed testimony and evidence: the rubber and friction tape insulation around the Kerney connectors was sufficient to insulate against a current of approximately 9,000 volts; the insulation was not pierced through by the Kerney connectors when the metal cover was bolted to the metal trough in which the connectors were lodged; the insulation around the wires lying within the metal trough was insufficient to insulate against approximately 9,000 volts; the voltage that caused the insulation around the connectors to be carbonized, and caused the burning of the two holes in the metal trough and the fusing of the connectors to the trough, was approximately 9,000 volts, instead of 440 volts, which was the intended capacity of the wires within the fertilizer plant. The Evidence further clearly discloses that there was nothing defective about the electrical wiring system and apparatus inside the fertilizer plant at the time of the accident; that there was no mechanical device within the plant which was power operated, which could have caused the accident; and there was no defect in wiring which could have caused the conveyor itself to be energized with electricity, resulting in the electrocution of appellees' decedents.
 
 
 46
 Moreover, a compelling consideration is that the electric wires and the Kerney connectors within the fertilizer plant had been in use for two months. The conveyor had been operated daily during that time, with employees pushing it around in the identical manner as did the two men who were electrocuted while performing the same task. There had been no grounding of current or no burning of insulation during all that time. No accident or incident had occurred to the wires in the plant, to the conveyor, or to the plant employees, until the morning of August 8, 1952. It was on that morning that appellants discovered trouble on their power transmission lines. And it was shortly after the power company found that its lines were defective that death struck swiftly.
 
 
 47
 In the light of the foregoing, I am of the opinion that appellees made out a case for the application of the doctrine of res ipsa loquitur. The proof of appellees that an excessive and dangerous charge of 9,000 volts was sent through appellants' power lines and the wires of the fertilizer plant, with the resultant electrocution of the two men, casts upon the defense the burden of an explanation consistent with due care. It is my view that the case should have been submitted to the jury under the rule of res ipsa loquitur.
 
 
 48
 However, the trial court declined to submit the case under this rule, but instead submitted it on the question of appellants' negligence.
 
 
 49
 There was evidence that the reclosers mentioned in the majority opinion should have been gang operated, and that such was the uniform practice in electric utilities; that otherwise, if one line was 'taken out' of a three-phase current, 'and you leave two of them, it will burn the equipment quickly' and also men, 'if they got on the other circuits.' This testimony conveys an ominous impression, but is not sufficiently definite or comprehensible to enable one to conclude from it that it constituted proof of negligence on the part of appellants. Nor did the theory of a surge of electric power, sent over the lines by appellants' employees, or evidence of a failure of inspection of appellants' apparatus, warrant a verdict on the ground of negligence. But, of course, it is not surprising that appellees were unable to prove, affirmatively, negligence on the part of the appellants, since the latter have almost exclusive knowledge with respect to how such an accident occurred; and it is only reasonable that the party having the power and opportunity should be required to give such an explanation and to prove that it did not occur through a lack of care on its part.
 
 
 50
 The case was very close, complicated and difficult and was tried by an able, conscientious and careful judge. In my view, the appellees did not prove, and it probably was beyond their power to prove, that appellants were guilty of negligence; and the judgments based thereon should therefore be set aside. However, appellees had the right to go to the jury under the doctrine of res ipsa loquitur, and the case, in my opinion, should be remanded for a new trial, in accordance with the foregoing.